### Boyle *v.* Case and others.

(*Circuit Court, D. Oregon.* November 28, 1883.)

1. COMPENSATORY DAMAGES—ELEMENTS OF, STATED.
     A person receiving a willful injury from another is entitled to recover compensatory damages therefor irrespective of the motive of the wrong-doer, or his own calling or condition in life.

2. PUNITIVE DAMAGES.
     When allowed in addition to compensatory damages, and what for.

3. VIGILANCE COMMITTEE.
     No plea of the public good or safety can justify a voluntary assemblage of people in inflicting a personal injury upon any individual, but in an action to recover damages therefor, the jury, in considering whether the plaintiff is entitled to punitive damages or not, may and ought to take into account the causes or motives which led the defendants to do the wrong complained of.

Action to Recover Damages for Personal Injury.

*A. H. Tanner, Robert Bybee,* and *W. Carey Johnson,* for plaintiff.

*George H. Williams, Rufus Mallory,* and *W. Lair Hill,* for defendants.

DEADY, J., (*charging jury orally.*)  You have heard the allegations of the parties, the evidence offered in support of them, and the argument of the respective counsel.  It now remains for you to determine the issue between them, under the instructions of the court.  The plaintiff claims that the defendants in this action, in connection with others, unlawfully arrested him at Astoria on the sixth of July last and confined him in jail; that they pretended to try him, and sentenced him to receive 25 lashes on his bare back, and, in pursuance of said sentence, caused him to be blindfolded, gagged and taken from the jail during the following night, onto the hill back of the town, where he was first tantalized or tortured by the information that he was to be hung, and then to receive 200 lashes, and finally was whipped on the bare back with a cat-o'-nine-tails,—five men giving him five lashes each,—when he was sworn upon his knees never to reveal what took place on that occasion, nor to harm any one engaged in the transaction; that he was then taken back to the jail, where he was left until morning, when he was taken in irons to the Portland steam-boat and sent away on her, for which he brings this action to recover $25,000 damages.  These facts are substantially admitted by the defendants; and, of course, there is no absolute defense to this action, and none is attempted to be made.

The burden of the defense is that the acts of which the plaintiff complains were done under circumstances that will not warrant or justify you in giving him what are called punitive or exemplary damages; and that he ought not to recover more than nominal damages. It is admitted that he is entitled to what are called compensatory damages, and therefore you must find a verdict for the plaintiff in some amount.  In this respect you have no discretion.  You must

find a verdict for such damages as will, in your judgment, compensate the plaintiff for the wrong and injury he has sustained at the hands of the defendants. What constitutes or may enter into the estimate of compensatory damages is well stated in section 615, Field, Law of Damages, from which I read to you, as follows:

"As a summary of the element of damages in such cases, it may be remarked that all cases of simple trespass, when no element of outrage or malice enters into the commission of the offense, only compensatory damages should be allowed, or such as will compensate the party for actual injuries, including loss of time, medical, and other expenses, physical pain, and mental anguish; as these are fairly and reasonably the plain consequences of the injury."

The value of one's time depends on circumstances. Where a person is in the receipt of a large salary, or has important matters committed to his charge, his time is correspondingly valuable. But when he is not engaged in any business, or has no lawful vocation, or is incapable of earning more than a mere living, or less, his time is less valuable. You must judge from the circumstances what loss the plaintiff has sustained on this account. He testifies that he suffered from the effects of the beating about two months. But how long he was thereby incapacitated from doing anything that he could or would do under ordinary circumstances you must judge. There is no evidence of medical expense, or medical treatment, except the cursory examination of his back at Dr. Chapman's office, for which no charge appears to have been made. The three important heads under which you will be called upon to consider the subject of compensatory damages are the physical pain, the mental anguish, and the personal indignity caused by and attendant upon the transaction. The physical pain and mental anguish which the plaintiff must have suffered under the circumstances cannot be exactly measured by dollars and cents, but the law cannot give any other compensation, and leaves it to your judgment, founded upon your experience and knowledge of men and things, to fix the amount which he ought to have. You are also to consider the personal indignity involved in the matter. A formal whipping is calculated to disgrace a man—to dishonor him in the eyes of the community or his fellows. But in this respect you will consider who the plaintiff is. All men are considered equal before the law, but they are seldom so in fact. In their condition and circumstances men are unequal. A man whose life is low, coarse, and brutal, who is accustomed to brawls, to knock-down and drag-out, may not feel the same degree of suffering and shame at being beaten or whipped as one who lives a higher and purer life, and who deserves and is accustomed to receive from his associates and the community personal esteem and favorable consideration. As I have said, what may be a great indignity to one person may not be felt to be such by another. Apply these suggestions to the circumstances of this case,

as they appear to you from the evidence, and allow the plaintiff what you think right on this account.

In estimating compensatory damages in this case, you will endeavor to reach a fair and just conclusion; and, in this respect, your conclusion ought not to be unfavorably affected towards the plaintiff by the number and respectability of the defendants, or the character of the motives or causes which induced them to act. Nor should these damages be diminished, so far as the physical pain and mental anguish are concerned, by the fact that the plaintiff is an obscure man in the lower walks of life—that he is a bar-tender, a professional gambler, or even a vagrant. The physical pain and mental anguish, which you find from the evidence the plaintiff suffered from the whipping and the attendant circumstances, you ought, by your verdict, to compensate him for, irrespective of his calling or condition in life. But the damages to be allowed for the indignity and disgrace involved in his treatment by the defendants, depend largely, as I have said, upon such circumstances.

You will next consider whether the plaintiff is entitled to punitive damages, and if so, how much. Punitive damages are such as are allowed, by way of punishment of the defendant, to discourage the commission of the wrong, as well as for compensation to the plaintiff. On this subject the author from whom I have just read (Field, Dam. § 615,) says:

"That when the elements of outrage, oppression, or malice enter into the commission of the offense, exemplary or punitive damages may be allowed, and the jury are not limited to actual compensation, but, blending together the rights of the injured party and the interests of the community, they may give such a verdict as will compensate for the injury received, and at the same time inflict some punishment upon the defendant for his wrongful act."

It was with a view of enabling you to judge fairly and justly in this matter that the court allowed the defendants to give evidence, showing how this committee that caused the plaintiff to be arrested and punished, originated—its purpose and general conduct, and particularly as respects the plaintiff. It appears from the evidence that this organization had its origin in this wise: On July 2, 1883, a large and destructive fire occurred in Astoria. At the time the place was full of people, more or less transient and doubtful in their character, connected with the fisheries, and the riot and dissipation which seems to be incident to that season. The community was excited by the fire—by the destruction of property—and the loss of a large amount of personal property which appears to have been carried away from the burning buildings and vicinity. The road-way over the water between the upper and lower town was partially destroyed by the fire. There were but six regular policemen, and they were fatigued and worn out with watching and running to and fro night and day. Under these circumstances the mayor of the town, Mr. John Hahn, issued a proclamation, calling a meeting of the council, and of the citizens,

to take into consideration the repair of the road-way and the appointment of special policemen. In this there was nothing wrong. The proposition involved the question of extraordinary expense, and whether the road-way should be repaired by general taxation or not, and the citizens were asked to meet with the council for the purpose of advising it in this emergency. The meeting advised the appointment of 40 special policemen, and called upon the citizens to volunteer their services as such, which suggested the agreement out of which this committee came. It reads as follows:

"We, the undersigned citizens of Astoria hereby pledge ourselves, in view of any riot or any other lawless body in our city, to arrest under the direction of the mayor and chief of police of our city, to quell the same by arms or otherwise."

There does not appear to be anything improper about this agreement. It was the result of the suggestion that all good citizens should be ready to volunteer in aid of the town authorities. And by way of manifesting who would do so, this paper was prepared and signed by some 123 persons. Out of this agreement came this committee, called the citizens' or vigilance, committee. The mayor testifies that he had no expectation they would "try" anybody, and that he did not approve of any such proceedings. But, as is usual in such cases, the larger body appears to have taken control, and the town council, as such, disappeared in the citizens' committee, which at once assumed some degree of permanence. In the mean time the timid, prudent, or distrustful fell into the background, while the more earnest, confident, enthusiastic, or reckless, came to the front and took the lead. The committee having thus assumed the authority to exist in place of the council, began to look around for something to do—something to justify its existence. The first thing it did was to give notice to some 16 persons, whom it considered obnoxious or dangerous, to leave the town. Its information in this respect appears to have been received from the chief of police. One of these notices was left with the plaintiff, who declined to receive it or obey it. Three or four days afterwards he was arrested by the chief of police, on the order of the committee, without any charge, and put in jail, in irons. Within a few hours he was taken to the committee room where he had a hearing before the committee, then composed of 30 or 40 persons, the defendant, Mr. Case, being in the chair. The plaintiff was examined as to his life, pursuits and conduct, from which it appeared that he was a native of Canada; had lived a short time in Arizona, from whence he came to Astoria a few weeks before; that he was a gambler by profession, and was then also tending bar, more for the purpose of exempting himself from the charge of vagrancy than otherwise; that he had been arrested some time before the fire for carrying a pistol, and forfeited his bail. No charge of any specific crime was laid against him, and, on the foregoing facts, and the further one that he had refused to leave the

town when warned, the committee determined that he should be punished by 25 lashes and sent away. He was then returned to jail and left there until about 12 at night, when he was taken out and whipped, as has been stated.

It is claimed for the defendants that their conduct, however unlawful, was influenced solely by a desire to promote the public safety in an extraordinary emergency, and not by any malice or ill-will towards the plaintiff personally. There is no evidence that any of the committee, and particularly these defendants, ever had any difficulty with the plaintiff or that any relation ever existed between them from which it might be inferred that they or any of them entertained any unkind feelings towards the plaintiff.

On the other hand, it is claimed by the plaintiff that the disturbance and danger attending the fire had practically passed away before his arrest, and that the defendants were actuated by a desire to punish him because he had presumed to disregard their notice to leave town, and that the sentence was imposed upon him, not for the public good, but as a punishment for having brooked the authority of the committee, and was also carried into execution with circumstances of wanton oppression and cruelty.

Much has been said to you in this connection by the leading counsel for the defendants, in extenuation, if not justification, of vigilance and citizens' committees, and it is maintained that there are times when the people of a place are justified in taking the law into their own hands, and administering justice in obedience to the methods of a higher law than that found in the books. But, gentlemen, we are here as the ministers of the law of the land, and we do not know, or recognize any other. We have taken a solemn oath to administer this law and be governed by it in the determination of this case. When we lose our hold on this storm-tried anchor we are adrift, without rudder or compass, on the dangerous sea of prejudice, passion, and falsehood. But at the same time, when you are called upon to ascertain and characterize the motives of the defendants, with a view of measuring the degree of culpability that attaches to their conduct, you must not shut your eyes to the facts that surrounded the transaction. This is not the first vigilance committee that has usurped the functions of municipal government in this country, and while our towns are governed by illicit and irresponsible classes, it may not be the last. But in my judgment, vigilance committees are but a choice of evils. They may palliate for a time, but cannot cure the disease that provokes them, and in the long run will probably aggravate it, by bringing all established law and authority into disrepute. If the good citizens of Astoria—the tax-payers—had attended to their municipal affairs, as they ought to have done, this trouble would probably have never come upon them. But this class are generally engrossed in their private affairs—given over to the pursuit of wealth, adding dollar to dollar and acre to acre—and leave the govern-

ment of the town to the idle, illicit, propertyless and vagrant classes. And here lies the source of this evil, and probably it will never be permanently cured until the right to vote in municipal elections is confined to those who contribute to the support of the corporation and are directly interested in its well-doing.

With this statement of the case and the claims of the parties, I submit the matter to you to say what damages the plaintiff ought to have and the defendants to pay. The court is the judge of the law, and the jury of the facts. Therefore, what I have said to you concerning the law of the case you are bound to consider as such, and be governed by it; but what I have said to you about the facts is only advisory, or said by way of suggestion, and it is to have only such weight in your deliberation as you think it is entitled to under the circumstances. You are judges of the credibility of the witnesses and the weight or consideration to be given to their testimony. This is no common case. It touches the foundation of civil society, and in some respects is of more importance to the public than the parties. The duty you are called upon to discharge in this case is one of the highest that falls to the lot of a citizen in a free, law-governed country, and I believe you will so regard it, and act accordingly.

The jury found a verdict for the plaintiff in the sum of $1,000.