## ROZA v. SMITH.

### (District Court, N. D. California. January 28, 1895.)

### No. 11,112.

FALSE IMPRISONMENT—DAMAGES.
  S., the master of a vessel lying at a remote point on the coast of Alaska, suspecting that one R. had instigated a seaman to desert, seized R., put him in irons, and confined him in the "run," on board the vessel, for about 9 hours, keeping him in custody altogether about 18 hours. S. justified this act as a necessity, in order to compel the return of the deserting seaman. *Held*, that punitive damages should be allowed to R. for this indignity and invasion of his liberty, and that $500 was a proper allowance.

Libel in personam to recover $10,000 damages for unlawful detention and imprisonment on board the American steam whaler Narwhal, of which H. P. Smith was master. Five hundred dollars awarded.

Walter G. Holmes, for libelant.
Page, Eells & Wheeler, for respondent.

MORROW, District Judge. The libel in personam was instituted to recover damages in the sum of $10,000 for the unlawful detention and imprisonment of libelant on board the American steam whaler Narwhal by H. P. Smith, the respondent, he being at that time master. There is no substantial controversy as to the material facts of the case. The libelant is a whaler, and resided in 1892 at a whaling station known as "Shooting Station," situated at Point Barrow, on the northern coast of Alaska. About July 20th of that year, the Narwhal was lying at anchor off Point Barrow, waiting for the ice to break up, so that she might proceed eastward to her destined whaling grounds. Among her crew was one Joe Peters, who was boat steerer and hunter. The libelant and Peters had, it seems, been previously acquainted. On the 20th of July, Peters, who had been watching for an opportunity to leave the vessel for some time before, obtained the captain's permission to absent himself from the vessel to visit the steam whaler Balaena, which was lying near by. This was, however, a mere pretense to get away from the vessel, and he proceeded to the shore with the intention of going to Cape Smythe, the headquarters of the Pacific Whaling Station, some 15 or 16 miles distant. The station or house occupied by the libelant is in the direction of Cape Smythe, and is some five or six miles from where the Narwhal was lying. Peters had, previous to his leaving that vessel, sent his clothes on shore by a native, and had directed

that they be left at Roza's house. He reached the latter's place about 7 or 8 o'clock in the morning, remained there a few minutes, and then proceeded on to Cape Smythe. It appears from the testimony that the captain was informed of his desertion about 10 o'clock in the evening. Whether this is 10 o'clock of the same day that Peters reached Roza's house, or of the day preceding, is uncertain. The fact that daylight prevails at this season of the year at Point Barrow during the whole 24 hours renders the question of time somewhat dubious. Some natives came on board the vessel, and reported that Peters had been seen on his way towards Roza's house. The captain ordered a search to be made, to ascertain whether Peters' clothing was still on board, and found that all his things had been taken from the vessel. He testifies that he then went on shore, accompanied by the second mate and another officer of the vessel, and, visiting Roza's house, had an interview with him. He states that Roza told him that Peters was not there, and further told him that "he [Peters] had deserted the ship; but, if he [Roza] knew where he was, he would not tell me, or give me any assistance in finding the man." But Roza swears that when he was asked about Peters he told them that he had seen him at his house about two hours before. The first mate, in his deposition, could not recall the conversation that passed between the captain and Roza, although as to other matters his memory was apparently good. After this first interview, the captain returned to the vessel, leaving the two officers on shore to make further search. The latter subsequently returned on board, bringing with them Peters' clothes, and reported that they had found them at Roza's house. In regard to this the first officer states in his deposition that he was authorized by the captain to search Roza's house; that the latter was not there when he made the search; that the only person present was a native woman, with whom, it appears, Roza was living; that he obtained her permission to search the premises, and found the clothes in the loft, concealed from view. The captain, on learning this, again repaired to Roza's house. The latter was then there. Capt. Smith accused him of having instigated Peters to desert. This Roza denied. The captain told him he should take him on board the vessel, and keep him there until Peters' return. Roza refused to go, and the captain, with the assistance of the two officers, put him in irons. It is denied by the captain that he resorted to this measure. He, however, admits that he took the irons with him, and went prepared to use them in case Roza should offer any resistance. The first officer, who was called as a witness for the respondent, corroborates the testimony of Roza that the irons were placed on him. Roza told the captain to take the irons off, and he would go with them on board the vessel. The irons were thereupon removed, and he went peaceably on board with the captain, arriving there about 1 o'clock in the afternoon. The two officers remained on shore to make further search. Meanwhile Roza was kept under close watch, so that he might not escape. When the two officers subsequently returned on board without having found Peters, he was again put in irons, and placed in the hold of the vessel.

The place where he was confined is described by him as being a small and dark compartment, which was used as a storeroom, and was called the "run," entrance to it being gained by a small hatch right in the middle of the cabin floor. The captain states that it was about 20 feet in length, and perhaps 26 feet in width, and 7 feet high; that it was used for keeping light stores which were being used constantly; that it was not very full at the time, and that there was a space of 6 feet in which one could move about. Roza swears that the place was dark, ill-ventilated, and so uncomfortable that he could not rest or sleep. He was given nothing to eat during the entire time of his incarceration. This, however, is disputed by the captain. He was placed in the "run," according to the captain's testimony, between 10 and 11 o'clock at night, and kept confined there in irons until between 7 and 8 o'clock on the following morning, when the captain received word that Peters had been found, and Roza was thereupon released. He had, therefore, been in close confinement in irons for about 9 hours, and in the custody of the respondent on board the vessel for about 18 hours altogether. The libelant suffered no physical damage, so far as the proof shows, and his recovery must be upon the basis of exemplary or punitive damages for the oppression, humiliation, and indignity he suffered by reason of the wrongful act of the captain. The latter justifies his course on the ground of the necessity incident to the situation in which he was then placed. He testifies that he considered that Roza had instigated Peters to desert, and that he deemed himself justified, under the circumstances, in holding him as a hostage until Peters' return or capture, for the reason that there was no court or official to whom he could appeal or apply for redress; that the ice was breaking up at that time, thus affording him an opportunity of proceeding on his whaling voyage; that, unless he availed himself of this chance, another might not have occurred again that season; that Peters was a skillful hunter, whom he could ill afford to lose. The captain lays great stress upon the fact that his delay in getting Peters back greatly hazarded his chance of getting out into the whaling ground, and imperiled the successful outcome of the whole enterprise. But how this situation could, under any circumstances, justify the captain in his treatment of Roza, who was not concerned in the voyage, it is difficult to understand. Even conceding, for the sake of argument, that Roza had been guilty of instigating or conniving at Peters' desertion, the captain had no right to punish him for that offense. Had there been a court of competent jurisdiction accessible to which the captain could apply for redress, the only remedy he could have had against the offender, aside from his civil action for damages, would have been a penalty under section 4601 of the Revised Statutes, which provides that "whenever any person harbors or secretes any seaman belonging to any vessel, knowing him to belong thereto, he shall be liable to pay ten dollars for every day during which he continues so to harbor or secrete such seaman, recoverable one-half to the use of the person prosecuting for the same, the other half to the use of the United States." No criminal liability is attached, so far as merchant vessels are concerned, to the

act of enticing or assisting or conniving at a seaman's desertion. But the preponderance of the evidence establishes affirmatively that Capt. Smith was mistaken in believing that Roza had anything to do with Peters' desertion. Peters testified that he did not consult Roza, or disclose to him his intention of leaving the vessel, and that Roza never suggested the subject to him, or knew of his intention. He further states that he sent his clothes to Roza's house by a native, without having told Roza that he was going to do so, or obtaining the latter's permission. Roza, on his part, denies emphatically that he did or said anything to induce Peters to desert, or assisted him in doing so, or that he knew of his intention to desert. The circumstances of finding Peters' clothes in Roza's house, and that Peters had stopped there on his way to Cape Smythe, added to the further fact that Peters and Roza had been previously acquainted, did not furnish the captain with a reasonable excuse for his conduct in arresting and detaining Roza in irons as a hostage for the return of Peters. The captain disclaims having been actuated by malice. But to support an action of this character, and to recover exemplary or punitive damages, it is not necessary that express malice should be proved. A wanton disregard of the rights of others, such as was displayed in this case, will suffice. In Johnson v. Ebberts, 11 Fed. 129, Judge Deady said:

"The plaintiff testified that the reason he had the defendant arrested was, 'He had my note, and I wanted to know how he got it.' But no one has a right to cause the arrest of another as an experiment, for the purpose of finding out who committed a particular crime. This is trifling with the liberty and good name of another, which the law does not justify or excuse. But it must appear that the arrest was malicious, as well as without probable cause, before the defendant can be held responsible in damages. It is not claimed that there is any direct evidence of malice, but only that it is sufficiently shown by the circumstances of the case. The malice necessary to sustain this action is not express malice, a specific desire to vex or injure another from malevolence or motives of ill will, but the willful doing of an unlawful act to the prejudice or injury of another. Frowman v. Smith, 12 Am. Dec. 268."

The libelant was kept in irons in the "run" for about 9 hours, and was restrained of his liberty, in the custody of the captain, for about 18 hours altogether, on board the vessel. The captain justifies putting the libelant in irons while in the "run" because he was afraid the latter might set fire to the vessel, or do some other mischief. But this does not appeal very strongly to the court in view of the unlawful character of the whole proceedings. If there was danger that the libelant would set the vessel on fire, or commit any other mischief, the danger arose primarily out of the misconduct of the captain in detaining him on board without authority of law, and it therefore affords no justification for the imprisonment. No case analogous in its features to the case at bar has been cited, nor have I been able to find any. In Boyle v. Case, 18 Fed. 880, the plaintiff was unlawfully arrested by a vigilance committee, and confined in jail. They pretended to try him, and sentenced him to receive 25 lashes on his bare back, and, in pursuance of said sentence, caused him to be blindfolded, gagged, and taken from the jail during the following night,

onto the hill back of the town, where he was first tantalized or tortured by the information that he was to be hung, and then to receive 200 lashes, and finally was whipped on the bare back with a cat o' nine tails,—five men giving him five lashes each,—when he was sworn upon his knees never to reveal what took place on that occasion, nor to harm any one engaged in the transaction; that he was taken in irons to the Portland steamboat, and sent away on her. It was shown that he was a gambler and bartender, and that the committee considered him an obnoxious and undesirable character, and took these measures to rid the town of him. He was awarded the sum of $1,000. In the case of Harris v. Railroad Co., 35 Fed. 118, the facts of that case are much stronger than in the case at bar, and $5,000 were there awarded. As before stated, the libelant in this case suffered no actual physical damage, and the test of any recovery by him must be based upon the oppression, humiliation, and indignity heaped upon him, the wanton and unjustifiable disregard of his rights, and the harshness of his treatment. "Punitive damages may be awarded when a wrongful act is done willfully, in a wanton or oppressive manner, or even when it is done recklessly,—that is, to say, in open disregard of one's civil obligations and of the rights of others. "The cases on the subject show that in the matter of assessing damages for false imprisonment, or for an assault or trespass, it is the duty of the jury to consider not only all the circumstances of aggravation attending the wrongful act, but, in some measure, at least, the nature of the right that has been invaded, and the effect upon social order of permitting a wrongdoer to escape without substantial punishment in case of a flagrant violation of the law and the rights of others." Fotheringham v. Express Co., 36 Fed. 252. Exemplary or punitive damages have a double object,—one to reward the person wronged, the other to punish the offender; the punishment partaking of the character of a fine or penalty as an example to deter others. Field, Dam. § 615; Boyle v. Case, supra; Fotheringham v. Express Co., supra; Railroad Co. v. Prentice, 147 U. S. 103, 107, 13 Sup. Ct. 261. In my judgment, the action of the respondent deserves punishment. It would, indeed, be establishing a most dangerous precedent if his conduct in this case should be recognized as lawful, or justified as a measure of necessity. The law of necessity, whatever may be its extreme limit in authorizing the use of violence as a means of self-defense or for self-preservation, does not justify the infliction of an injury upon a third party who is a stranger to the situation. This was the position of the libelant in this case. He had no interest in the controversy between the captain and the deserting seaman, and was under no obligation to assist in the capture and return of the latter. The most that can be said is that he was not greatly damaged. The humiliation of being confined on board of a vessel in the uninhabited and inhospitable Arctic regions cannot be said to be a very serious matter. The law, however, extends to every foot of American territory, and to the deck of every American vessel, and must be enforced as well in the Arctic Sea as in the port of San Francisco. No claim is made for damages on account of the act of the master in arresting the libelant on land.

The libel is confined to the marine tort arising out of the imprisonment on board the vessel, that being the only part of the transaction within the jurisdiction of this court. For this injury I will allow, as full compensation, the sum of $500.