### UNITED STATES v. BERGDOLL et al.
#### and four other cases.

(District Court, E. D. Pennsylvania. April 26, 1921.)

Nos. 9, 10, 12, 13, and 16.

1. **Time ⬦9(1), 10(1)—Notice of induction into military service held too short, on excluding first day and Sunday.**
   Under the Selective Service Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 2044a–2044k), which recognized a distinction between those liable to military service and those actually inducted into service, and required a notice to be given to the individual 10 days before he was to report for induction into service, exclusive of the day of service of the notice and of Sundays and holidays, notices which were served on a Monday and ended with Thursday of the next week were 9 days only, when the day of service and the intervening Sunday were deducted.

---

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. **Criminal law ⬉922 (3)—Defendant held entitled to new trial, if error in charge affecting all but two counts was committed.**

Where defendants were tried on 5 indictments, containing a total of 40 separate counts, all but 2 of which were based on the offense of aiding desertion from the military service, or on conspiracies to commit that offense, defendants will be granted a new trial, in the discretion of the court, if there was error in charging that the persons aided were in the military service, though the other 2 counts charged obstruction of recruiting.

3. **Army and navy ⬉20—Selective service boards not held to verbal niceties.**

The selective service boards, who were without special training, and who were required to act without great deliberation in view of the emergency, will not be held to the verbal niceties of special pleading; but the courts will look to the substance of what was done by them, rather than to the mere formal mode by which it was done.

4. **Army and navy ⬉20—Person selected is in military service 10 days after notice, which specified only 9 days.**

Where the notice given by the selective service board to an individual, requiring him to report for service, designated a day for him to report which was one day less than the 10 days to which he was entitled under the Selective Service Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 2044a–2044k), that fact did not invalidate the notice, but the person so notified became inducted into the military service on the tenth day after the notice was served.

5. **Conspiracy ⬉41—Overt act by one conspirator establishes guilt of all.**

While proof of overt act is essential to establish the offense of conspiracy, that act need not be participated in by all the conspirators, but the act of one in furtherance of the conspiracy makes the guilt of all complete.

6. **Criminal law ⬉935 (1)—Defendants held not entitled to new trial, though evidence did not sustain two counts.**

Where defendants were tried on 5 indictments, containing in all 40 counts, all but 2 of which were for aiding or conspiring to aid desertion, a new trial will not be granted because the evidence was insufficient to show their guilt of the other 2 counts, which charged obstruction of recruiting.

7. **Criminal law ⬉922 (1)—Defendants cannot, on motion for new trial, complain that status as soldiers was submitted to jury.**

Defendants cannot complain, on motion for new trial, that the trial judge submitted to the jury the question whether the men whose desertion defendants were charged with aiding were soldiers, where that conclusion followed as a matter of law from the facts submitted.

8. **Criminal law ⬉878 (4)—Verdict not impaired by inconsistency of findings as to some defendants.**

A verdict in a prosecution on several indictments containing numerous counts against different defendants is not invalidated because, as to several of the defendants, it was not logically consistent under the evidence.

Emma C. Bergdoll and others, Charles Braun and others, Charles Braun, Emma C. Bergdoll, and James E. Romig were convicted on five separate indictments of conspiracy to aid soldiers in military service in deserting. On motion for new trial. Motion refused.

T. Henry Walnut, Asst. U. S. Atty., and Chas. D. McAvoy, U. S. Atty., both of Philadelphia, Pa., for plaintiff.

Theodore Lane Bean, of Norristown, Pa., for defendants.

⬉For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

DICKINSON, District Judge. The trial of this case, so far as it involved the work of counsel concerned, was marked both by ability and conspicuous fairness. These two qualities go together. As a result the record is clear of objections to trial rulings, except those intended to raise clear-cut questions of law.

There were 5 indictments submitted, involving five defendants who were tried. The five tried were indicted with two others who were not tried. The 5 indictments involved a total of 40 separate counts. As counsel for defendants analyzes the counts of the indictments, all of them, except 2, charge either an individual act or a conspiracy with others to commit the offense of aiding Grover C. Bergdoll and Erwin R. Bergdoll, soldiers in the military service of the United States, in deserting. These persons are the two named in the indictments who were not tried. The excepted counts are the fourth in the indictment which bears the number 9 and the third in No. 10. These indictments are against joint defendants; the others against individual defendants. These excepted counts charge a conspiracy to obstruct recruiting, etc. The individual indictments make no charge of obstruction.

The first question raised, and, indeed, the only question of law raised, is whether or not the men not tried were in the military service of the United States. The value of the determination of this question lies on the surface of it. It is true that, inasmuch as each conspiracy indictment contained a count for obstructing recruiting, etc., the question of being in the military service would as to these counts be of no vital importance; but as 3 of the indictments upon which there was a conviction made no such charge against the particular defendant there concerned, the point raised is as to these indictments of controlling importance. Whether the fact is disclosed by this technical record or not, it is the fact that Grover C. Bergdoll and Erwin R. Bergdoll each are under the sentence of a military court for the military offense of desertion. This necessarily involves the finding that each was in the military service. The fact adverted to may be of no legal importance, but it does involve the possible practical consequence of having one finding made by one court and another by another court. Such a result would, of course, be regrettable; but none the less, inasmuch as the District Courts, as trial courts, deal with the rights of individual defendants before them, if it be the right of these defendants to have this question determined otherwise than as it has been determined by another tribunal, they must be accorded all their rights, whatever the consequences.

The argument addressed to us by the very capable counsel for the defendants is of crystal-like clearness. Without any purpose to paraphrase it, but merely to present the point sought to be made, it is that the Universal Service Act (Comp. St. 1918, Comp. St. Ann. Supp. 1918, §§ 2044a–2044k) begins with the broad statement that all persons belonging to the described classes, with the exceptions enumerated, were liable to be called upon for military service. The two men involved in this case were admittedly so liable. The distinction is set up, however, between admissibility or liability to service and being in the service. The question with which we are confronted is not wheth-

er these men were eligible for induction, but whether they were actually inducted, into the service. The act of Congress provides the machinery of induction. A part of it is that the members of this eligible class shall appear before an appropriate board, clothed with power to determine, at least in the first instance, the liability of the individual to be called to service, his physical equipment for service, and the propriety of his being called into service.

There is a further machinery provided to bring the individuals concerned before the board, and to afford a full opportunity to reach the required decision by the board. When an individual is thus selected for service, there is a further machinery provided for bringing him in fact and reality into the service..

There is thus a dividing line, clearly recognized, if not drawn by the act of Congress, not only between those who are thus brought into liability to military service and those who are exempted out of it because of ineligibility, but also between all those who have been actually inducted into the service and those who have not been, although eligible to service and under an obligation to serve. This line is recognized, in that it is made an offense to obstruct recruiting, and thereby preventing an actual entry into the service, and it is also made an offense to desert from the service after having been inducted. These are offenses different in character by every test which can be applied for the purpose of distinguishing offenses.

[1] A part of the machinery of induction, and the part with which we are concerned, is notice to the individual concerned. He was to have the notice provided in the act of Congress. This gave him, between the time of his selection and the time when he became actually in the service, 10 full days, exclusive of what are sometimes called "lay days" or "free days." These days are defined by Congress.

The notice to Grover C. Bergdoll began with Monday, July 29, 1918, and ended with Thursday, August 8th. Excluding the day of commencement and the intervening Sunday, the count is 9 days, and not 10. In like manner, in the case of Erwin R. Bergdoll, the notice began on Monday, April 29, 1918, and ended with Thursday, May 9th. Striking out the day of the beginning of the notice and the intervening Sunday, we again have a count of 9 days.

[2] A point which specifically and clearly raised the question now raised was presented to the trial judge and was negatived. If this was error, it was reversible error, and goes to every one of the indictments. The application to some of the indictments is clear, because the only offense charged involved desertion. It is true that each of 2 of the indictments contained a count which involved the offense of obstructing; but this latter charge was coupled with other charges, in the same indictment, involving the offense of desertion.

In the exercise of the discretion of a trial court, we think a new trial should be granted, if there was error in the instruction given to the jury. The effect of false instruction in this respect would be too uncertain to warrant us in sustaining any part of the findings. This brings us to face squarely the question of error or no error.

[3] There are two or three general observations which are not out

of place. The question raised involves the work of the selective service boards. Many of the men on these boards—indeed, nearly all of them—were without special training or experience in the work they were called upon to do. However willing we might be, because of this, to accept excuses for mistakes, we cannot, of course, condone errors which deprive others of their rights. At the same time, in reviewing their work, it would be nothing short of folly to hold them to the verbal niceties and sometimes almost painful preciseness and accuracy of special pleading. Every man appearing before them is to be upheld in every assertion of his rights. War, however, is a very practical kind of business, and battles might be lost and the doom of a nation sealed, if too great deliberateness prevailed in the councils of those in charge of the recruiting service. Here, as perhaps nowhere else, we are to look to the substance of what is done rather than to the mere formal mode in which it was done.

Another thought is that the men called to the military service of their country have their part in the workings of the Selective Service Act as well as the boards. The thought back of this act of Congress is an inspiring one. All the people join in making it. It is a law self-imposed by a self-governing people. There is no thought of conscription in it. "Conscript" has come to have a bad sound. The thought is universal service. All the people place themselves voluntarily at the call of the country in its need. They are all volunteers. There are no conscripts. The only work is that of selection. Who are best fitted and best equipped for the special service required, for which all have offered themselves? Congress took the first step in selection, and brought the number of volunteers within manageable limits by shutting out all except males coming within certain age limits and making special exclusions. The duty of a closer and more individual selection was committed to the boards constituted for the purpose. When they had made their final selection and classification, the man to whom the opportunity for service was still open was notified. He had 10 days in which to report for service.

[4] Just here arises another thought. He was entitled to notice. This was his right. No question is raised, however, in the instant case that the notice was not given and received. When notice was given him of his selection, he had 10 days during which he kept his status as a civilian. This, also, was his right. Until the expiration of the 10 days he could not have committed a military offense, because he was not in the military service. It is to be observed that his status was changed when and as changed by the power of the law, and not the ruling of the board.

When Erwin R. Bergdoll, on April 29, 1918, received notice of his selection, the law visited upon him the consequence, as a consequence, that 10 days thereafter he became a soldier. Let it be admitted, as it seems to us it must be, that the day the law worked this change was Friday, May 10th, and not earlier; what of it? Let it be admitted, as again we think it must be, that if he had been charged before May 10th with an offense which could only be committed by a man in the service, he would not have been guilty; what, again, of that? It is

not pretended that the 10 days here has any such significance. All that is contended is that the board miscounted the 10 days, and thought they were up on May 9th, instead of May 10th, and that because of this all the results of the operation of the statute and the work of the board was annulled.

The position taken in this particular case is even more advanced still, because it must be that the result is not only annulled, but avoided beyond recall. We say this for the reason that a request for a rehearing on the question of classification was made to the board. This request the board did not grant, but because of it the time given in which to report for duty was recalled, and a later date fixed, which gave Bergdoll much more time than the 10 days allowed him by law. There is, in consequence, no fact merit in the complaint made. Irrespective even of the second notification given, we refuse to accept the inference drawn that the notice of selection and the consequent duty to report 10 days thereafter became a nullity merely because of a miscount of the number of days by the board.

Our view is that by force of the act of Congress Bergdoll was in the service of the United States as a soldier after 10 days from the time of notice to him of his selection. There is, moreover, room for the distinction, which has been pressed upon us, but into which we will not go, between void judgments and those which are merely voidable The argument of counsel for defendants would seem to embrace the view that Bergdoll became a soldier only by force and virtue of the finding and declared judgment of the board. Even if so, all which is said against it is that the judgment was prematurely entered.

There were good reasons for not disposing of the present motion until now. In the interim we have had the benefit of the ruling of the United States District Court for the District of Kansas, First Division. It is of direct bearing and value, because of the circumstances that it disposes, not merely of the very question raised before us, but of that question arising out of the same state of facts. In re Petition of Edwin R. Bergdoll (not yet reported). Irrespective of the conclusion reached being in accord with our views, we think the ruling made, as well as that of the military courts, should be accepted and followed by this court. We have, because of this, restricted this opinion to the main point raised, assuming the minor questions to be out of the way.

[5] 2. The second point made is that there is no evidence of any act done by the defendants tending to obstruct recruiting, etc. This point is clinched by the statement that in the individual indictments no such act is charged against any one of them. The distinction, which is undoubtedly a real one, is between a conspiracy to commit an offense and the commission of the offense itself. There must, of course, in a conspiracy offense, appear both the conspiracy and an act in its furtherance. The conspiracy has been found. The objective offenses were two—obstruction and desertion, or either. There must have been what is called an overt act; but this need not have been the act of all the conspirators. The act of any one after the conspiracy has been once formed makes the guilt of all complete.

There is this to be said about the charge of conspiracy. A number

of years ago the professional opinion was 'that a charge of conspiracy was so difficult to establish that counsel always hesitated to charge it. Now it is recognized as a charge so easy to prove that it almost proves itself, where the evidence of the offense or the attempt to commit is clear, and the defendants were in any way connected with it beforehand and have acted together.

[6] This second point is, moreover, of little practical value. If the court was wrong in permitting the jury to make a finding of the desertion offense, we would not sustain the verdict on the obstruction charge. The converse, as a practical proposition, does not hold good, because, if defendants are guilty of the desertion charge, they are without doubt guilty of the other offense; if the conspiracy antedated the induction of the brothers into the service, and the conspiracy had for its object first keeping them out of the service, and after they were in getting them out by making deserters of them.

3. What has already been said covers the third point made. It is essentially the same, and is rested upon the asserted fact that there was no evidence of anything done prior to the induction into the service. This assertion has already been disposed of. There was evidence of things done by the Bergdolls, and this is sufficient. Here, again, the point made is of little practical importance. The desertion offense would sustain the verdict, and a new trial would not be granted, even if the evidence did not strongly support the finding of a conspiracy antedating induction into the service.

4. The fourth point made is the same point in a somewhat different guise.

5 and 6. The fifth and sixth points made are admittedly merely cumulative. It is not altogether clear that anything further is intended by the excerpts from the charge.

[7] The trial judge felt it was his duty to charge the jury that, if the facts were found to be as charged, the conclusion followed as a matter of law that these men were soldiers. It is true the whole question was left to the jury to find; but of this the defendants cannot complain, and we assume are not complaining.

[8] 7. Counsel for defendants could not very well feel free to make a differentiation among the defendants. It might carry a consequence which counsel did not intend. We are, however, not so hampered, and think such differentiation may be made. The personal feeling between the defendant Charles Braun and his brothers was such as that the jury might have been persuaded that he disapproved of the conduct of his brothers, and, in consequence, was not in a conspiracy to have done that to which he was opposed. The jury, moreover, gave an effect to some of the evidence as against Braun which they did not give to it as against one or more of the other defendants. The jury, however, has found that Braun was in the conspiracy, although doubtless convinced, as the trial judge was, that his moral guilt was less and his motives less criminal than those of some of the others. In strict logic, certain features of the testimony bore as strongly against the defendants whom the jury favored as it did against Charles Braun. The argument is, as a result, logical that, if these witnesses were telling the

truth, all the defendants were equally guilty. If they were not telling the truth, Braun was not guilty.

Among the admirable qualities of the human mind and character, consistency is singled out as a jewel. Just what meaning this figure of speech is meant to carry is not·clear. No one, however, is to be condemned for not possessing jewels, and he who has them is not expected to have them on view at all times. Mere formal logical consistency is not one of the crown jewels of juries, and happily so. There was an evident practical reason for a jury relenting in its feeling toward two of the defendants. In consequence this feeling was manifested. There was not the same reason respecting the other defendants. Again, in consequence, it was not manifested. The relenting toward some of the defendants, and the refusal to so relent toward others, may show a logical inconsistency, but it does not impair the legal value of the finding.

The motion for a new trial is refused, and the district attorney may move for sentence.