**AMERICAN MEDICAL ASS'N v.
UNITED STATES.**

**MEDICAL SOC. OF DISTRICT OF
COLUMBIA v. SAME.**

Nos. 7929, 7930.

United States Court of Appeals for the
District of Columbia.

Decided June 15, 1942.

As Amended Sept. 21, 1942.

Writ of Certiorari Granted in Part
Oct. 12, 1942.

See —— U.S. ——, 63 S.Ct. 44, 87 L.Ed. ——.

Messrs. Seth W. Richardson and William E. Leahy, both of Washington, D. C., with whom Messrs. Edward M. Burke, of Chicago, Ill., and Charles S. Baker, and Warren E. Magee, both of Washington, D. C., were on the brief, for appellant in each case.

Messrs. John Henry Lewin and Grant W. Kelleher, Special Assistants to the Attorney General, with whom Thurman W. Arnold, Assistant Attorney General, and Messrs. E. Compton Timberlake and Walton S. Allen, both of Washington, D. C., were on the brief, for appellee in each case.

Mr. Edward M. Curran, United States Attorney, of Washington, D.C., also entered an appearance for appellee in each case.

Before MILLER, RUTLEDGE and MARTIN, Associate Justices.

MILLER, Associate Justice.

In United States v. American Medical Association,[1] we held that the term "in restraint of trade" as used in Section 3 of the Sherman Act, 15 U.S.C.A. § 3, had its genesis in the common law; that the practice of medicine was recognized by the English cases as constituting trade; that a restraint imposed upon the practice of medicine may constitute a restraint of trade; that restraints imposed upon the operation of hospitals and upon Group Health Association, designed to prevent it from making available to and financing medical services on behalf of its members may constitute restraint of trade; that the indictment under which appellants were charged stated a case under Section 3 of the Sherman Act. Accordingly, we held that the indictment was sufficient as against a demurrer; we reversed a judgment of the District Court, which had sustained a demurrer, and remanded the case for trial.. Upon the trial which followed and at the close of the Government's case the court directed verdicts of acquittal for two unincorporated associations and two individual defendants. Thereafter the jury convicted the appellants and acquitted all other defendants. Appeals from the judgment of the District Court, based upon these convictions, were consolidated for hearing in this court.

On this appeal it is suggested that the Supreme Court, in Apex Hosiery Co. v. Leader,[2] repudiated the doctrine stated in our earlier decision; hence that we should reconsider and abandon the position which we there took. But we see no reason to adopt the suggestion which, apparently, grew out of appellants' failure to distinguish between *trade* and *restraint of trade*. Appellants' confusion is evidenced by the following statement from their brief: "The Apex case held in substance and effect that no activity could be in 'trade' unless it was a commercial activity and exercised and used in such a way as to affect the market either by fixing prices or suppressing competition in the market to the injury of the public." Of course the Court did not so hold, nor has any court ever so held. Most activities which are in trade serve, rather than injure, the public.

In the Apex case,[3] no question was involved as to whether the petitioner was engaged in trade or commerce. The opening sentence of the opinion states, as an undisputed fact: "Petitioner, a Pennsylvania corporation, is engaged in the manufacture, at its factory in Philadelphia, of hosiery, a substantial part of which is shipped in interstate commerce." Neither was the Court in doubt as to whether trade or commerce was affected by the actions complained of.[4] The question which was presented for its

[1] 72 App.D.C. 12, 110 F.2d 703, certiorari denied 310 U.S. 644, 60 S.Ct. 1096, 84 L.Ed. 1411.

[2] 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044.

[3] 310 U.S. 469, 480, 60 S.Ct. 982, 985, 84 L.Ed. 1311, 128 A.L.R. 1044.

[4] Apex Hosiery Co. v. Leader, 310 U. S. 469, 484, 60 S.Ct. 982, 987, 84 L.Ed. 1311, 128 A.L.R. 1044: "Cessation of petitioner's manufacturing operations, which respondents compelled, indubitably meant the cessation of shipment interstate. The effect upon the commerce

decision was whether the conduct of the labor union and its members constituted *restraint* of trade, within the meaning of Section 1 of the Sherman Act, 15 U.S.C.A. § 1.[5]

In answering this question the Court, first, restated the familiar common law doctrines relating to contracts and combinations in restraint of trade and the equally familiar history of the taking over, by the Sherman Act, of the common law concept of illegal restraints.[6] It then concluded that (1) the Sherman Act does not condemn all combinations and conspiracies which interrupt interstate transportation;[7] (2) labor unions are to some extent and in some circumstances subject to the Act;[8] but (3) it does not apply to all labor union activities affecting interstate commerce;[9] (4) the evil at which the Sherman Act was aimed was the control of the market "by suppression of competition in the marketing of goods and services * * *";[10] (5) the end sought was the prevention of "restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services * * *";[11] and, finally (6) "Restraints on competition or on the course of trade in the merchandising of articles moving in interstate commerce is not enough, unless the restraint is shown to

have or is intended to have an effect upon prices in the market or otherwise to deprive purchasers or consumers of the advantages which they derive from free competition."[12]

The trade or commerce which was involved in the present case was of three kinds: (1) The making available and financing of medical and hospital services; (2) medical service itself, i.e., service rendered by medical doctors; (3) hospital service, i.e., service rendered by hospital staffs and the use of hospital facilities. As we indicated in our earlier opinion the common law recognized the practice of medicine as being trade[13] and there is nothing in the Apex case to suggest the contrary. It may be regrettable that Congress chose to take over in the Sherman Act the common law concept of trade, at least to the extent of including therein the practice of medicine. Developments which have taken place during recent decades in the building up of standards of professional education and licensure, together with self-imposed standards of discipline and professional ethics, have, in the belief of many persons, resulted in substantial differences between professional practices and the generally accepted methods of trade and business. As we pointed out in our earlier decision,[14] the American Medical Association and other local medical associations have undoubtedly made a pro-

resulted naturally and inevitably from the cause. The occupancy of petitioner's factory by the strikers prevented the shipment of the substantial amount of merchandise on hand when the strike was called. In point of the immediacy of the effect of the strikers' acts upon the interstate transportation involved and of its volume, the case does not differ from many others in which we have sustained the Congressional exercise of the commerce power."

[5] Apex Hosiery Co. v. Leader, 310 U.S. 469, 487, 490, 60 S.Ct. 982, 988, 84 L.Ed. 1311, 128 A.L.R. 1044: " * * * the question to which we must address ourselves is whether a conspiracy of strikers in a labor dispute to stop the operation of the employer's factory in order to enforce their demands against the employer *is the kind of restraint of trade* or commerce at which the Act is aimed * * *. Since in the present case, as we have seen, the natural and predictable consequence of the strike was the restraint of interstate transportation the precise question which we are called upon to decide is whether *that re-*

*straint* resulting from the strike maintained to enforce union demands by compelling a shutdown of petitioner's factory *is the kind of 'restraint of trade or commerce'* which the Act condemns." [Italics supplied]

[6] Apex Hosiery Co. v. Leader, 310 U.S. 469, 497, 498, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044.

[7] Apex Hosiery Co. v. Leader, 310 U.S. 469, 486, 491, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044.

[8] Id., 310 U.S. at page 489, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044.

[9] Ibid.

[10] Id., 310 U.S. at page 493, 60 S.Ct. at page 992, 84 L.Ed. 1311, 128 A.L.R. 1044.

[11] Ibid. and see note 15.

[12] Apex Hosiery Co. v. Leader, 310 U.S. 469, 500, 501, 60 S.Ct. 982, 996, 84 L.Ed. 1311, 128 A.L.R. 1044.

[13] United States v. American Medical Association, 72 App.D.C. 12, 20, 110 F.2d 703, 711, certiorari denied 310 U.S. 644, 60 S.Ct. 1096, 84 L.Ed. 1411.

[14] Id., 72 App.D.C. at pages 20, 21, 110 F.2d at pages 711, 712.

found contribution to this development. However, our task is not to legislate or declare policy in such matters but, rather, to interpret and apply standards and policies which have been declared by the legislature. That Congress did use the common law test there is no doubt. That Congress was not otherwise advised was perhaps because of the failure of the professional groups to insist upon the distinction and to secure its legislative recognition. In any event, there is no doubt that Group Health Association was engaged in trade or commerce, within the meaning of the applicable section of the statute.[15] It is not necessary, in order to constitute trade or business, that it shall be carried on for profit.[16] Appellants protest that the District Court has said in Group Health Association v. Moor:[17] "The actions of the plaintiff [G.H.A.] in no way tend to commercialize the practice of medicine." They argue from this that the activities of Group Health Association were not commercial activities and hence not in trade within the meaning of the Sherman Act. But this argument misses the point. The activities of Group Health Association are commercial, but because the lay executives of Group Health Association do not in any way interfere with the professional work of the medical doctors, their commercial activities do not tend to commercialize the *practice* of medicine. Medical doctors have long conceded the propriety of medical services furnished by large industrial organizations, to their employees, by doctors also in their employ.[18] There is no greater

[15] Nonprofit cooperative associations have been held to be "doing business" in a variety of situations. For purposes of taxation: Maryland & Virginia Milk Producers' Ass'n, Inc., v. District of Columbia, 73 App.D.C. 399, 119 F.2d 787, certiorari denied 314 U.S. 646, 62 S.Ct. 87, 86 L.Ed. ——; Hazen v. National Rifle Ass'n, 69 App.D.C. 339, 347, 101 F.2d 432, 440; Memphis Chamber of Commerce v. City of Memphis, 144 Tenn. 291, 296, 297, 232 S.W. 73, 74; Sears, Roebuck & Co. Employees' Savings & Profit-Sharing Pension Fund v. Commissioner of Internal Revenue, 7 Cir., 45 F.2d 506, 509. For purposes of qualifying to do business under the corporation laws of a foreign state: Ku Klux Klan v. Commonwealth ex rel. State Corporation Commission, 138 Va. 500, 509, 122 S.E. 122, 125; State ex rel. Griffith v. Knights of Ku Klux Klan, 117 Kan. 564, 572, 573, 232 P. 254, 258, 37 A.L.R. 1267; 17 Fletcher Cyc. Corp. (Perm.Ed.) § 8467. For purposes of compliance with legislation regulating corrupt political practices: La Belle v. Hennepin County Bar Ass'n, 206 Minn. 290, 294, 288 N. W. 788, 790, 125 A.L.R. 1023. For purposes of service of process on agents: Pacific Typesetting Co. v. International Typographical Union, 125 Wash. 273, 277, 216 P. 358, 360, 32 A.L.R. 767. Cf. Roman Catholic Archbishop v. Industrial Accident Commission, 194 Cal. 660, 670, 671, 230 P. 1, 5 (religious corporation sole held sufficiently engaged "in trade or business" to warrant application of Workmen's Compensation Law); Gardner v. Trustees of Main Street M. E. Church, 217 Iowa 1390, 1395, 250 N.W. 740, 745, 746, superseding opinion in 244 N.W. 667, 668; Note, 18 Iowa L. Rev. 557.

[16] Hazen v. National Rifle Ass'n, 69 App.D.C. 339, 345, 101 F.2d 432, 438, and authorities there cited.

[17] D.C., 24 F.Supp. 445, 446.

[18] Virginia Iron, Coal & Coke Co. v. Odle's Adm'r, 128 Va. 280, 305, 105 S. E. 107, 115; McCord, The Economics of Industrial Medicine, Proceedings of the Annual Congress on Medical Education, Medical Licensure and Hospitals (1932) 83; Leland, Contract Practice, Id. at 75, 81: "That there are many conditions under which contract practice is not only legitimate and ethical, but in fact the only way in which competent medical service can be provided, becomes evident on analysis. For instance, when large numbers of workmen are employed remote from urban centers, as in some mining or logging camps, efficient medical service can be secured only by contracting with some competent physician to do the work. Certain industrial situations arise wherein large employers of labor are compelled by law to provide medical services for their employees under certain conditions, and this at times can be secured only by some form of contract."; Laufer, Ethical and Legal Restrictions on Contract and Corporate Practice of Medicine, 6 Law and Contemp. Prob. 516, 524-527; Note, 48 Yale L.J. 346, 349.

Similar questions have arisen in connection with other professions. For a general discussion see Note, 44 Harv.L. Rev. 1114. As applied to practice of law see Merrick v. American Security & Trust Co., 71 App.D.C. 72, 77, 107 F. 2d 271, 276, certiorari denied 308 U.S. 625, 60 S.Ct. 380, 84 L.Ed. 521; 6 Fletcher Cyc. Corp. (Perm.Ed.) § 2524; 5 Law and Contemp. Prob. No. 1 (pp. 1-174).

incongruity in the making available of medical services by a cooperative association or a nonprofit mutual benefit association, in similar manner; nor any more reason for suggesting that such industrial organizations are not engaged in commercial activities. In each case the service is rendered in accordance with the standards of the profession and to that extent uncontrolled by the corporate employer.[19] But, at the same time, the salaries of such professional employees may undoubtedly be paid by the corporation and charged as an ordinary and necessary expense of business.[20] Although there is authority for the proposition that for some purposes charitable hospitals are not engaged in trade, business or industry,[21] we have no doubt that the hospitals described in the indictment were engaged in trade and commerce within the meaning of the common law and of the Sherman Act.[22]

So far as Group Health and the hospitals are concerned, therefore, their activities are properly described as business and commercial in character. There is also no question that commercial and business competition was not only the possible but the probable result of Group Health's activities. Consequently—entirely apart from any direct restraint upon the practice of medicine itself—if a conspiracy was shown, the purpose of which was to restrain competition, raise prices, or otherwise control the market to the detriment of purchasers or consumers of medical or hospital services, by destroying or injuring Group Health Association, it was sufficient to sustain the conviction.

The fact of commercial and business competition is the predominant note in the controversy which preceded the initiation of criminal prosecutions in these cases.[23] One of the major purposes of Group Health

---

[19] Pearl v. West End St. Ry. Co., 176 Mass. 177, 179, 57 N.E. 339, 49 L.R.A. 826, 79 Am.St.Rep. 302.

[20] 53 Stat. (Part I) 12, 26 U.S.C.A. Int.Rev.Code, § 23(a) (1); Corning Glass Works v. Lucas, 59 App.D.C. 168, 170, 171, 37 F.2d 798, 800, 801, 68 A.L.R. 736, certiorari denied 281 U.S. 742, 50 S.Ct. 348, 74 L.Ed. 1155; Elm City Cotton Mills v. Commissioner of Internal Revenue, 5 B.T.A. 309, 312; 1 Montgomery, Federal Tax Handbook (1940) 417.

[21] Private hospitals, supported by appropriations and charity, held not an industry, and its employees not engaged in "industry, trade, craft or occupation" within the meaning of Anti-Injunction Act, 43 P.S.Pa. § 206a et seq. Western Pennsylvania Hospital v. Lichliter, 340 Pa. 382, 387, 17 A.2d 206, 209, 132 A.L.R. 1146. A charitable home for girls held not a "business, trade, or industry" within legitimate operation of power to make city zoning laws. City of Rochester v. Rochester Girls' Home, Sup., 194 N.Y.S. 236, 237. A charitable home for the aged not a business within the sense of a restrictive covenant. Easterbrook v. Hebrew Ladies' Orphan Society, 85 Conn. 289, 298, 82 A. 561, 564; Note, 41 L.R.A.,N.S., 615. A municipal ordinance declaring hospitals for profit to be nuisances does not discriminate in favor of charitable hospitals, as the distinction is reasonable. The former are and the latter are not "businesses." Lawrence v. Nissen, 173 N.C. 359, 364, 91 S.E. 1036, 1038.

[22] In Jordan v. Tashiro, 278 U.S. 123, 127-129, 49 S.Ct. 47, 48, 73 L.Ed.

214, it was held that operation of a hospital was included within the meaning of the words "trade" and "commerce" as used in a treaty authorizing Japanese subjects in the United States "to carry on trade" and to "do anything incident to or necessary for trade upon the same terms as native citizens or subjects * * *." Cf. Lawrence v. Nissen, 173 N.C. 359, 364, 91 S.E. 1036, 1038: "The establishment and conduct of hospitals for pay is now a recognized and established business." In Armendarez v. Hotel Dieu, Tex.Civ.App., 145 S.W. 1030, 1031, it was held that in so far as a hospital accepted paying patients for the purpose of obtaining revenue to carry on its charitable work, it was carrying on a business.

[23] The identification of "fair competition" with ethical principles is expressed in the Principles of Medical Ethics of the American Medical Association and in the Constitution of the District Medical Society.

Chapter III, Article VI of the Principles of Medical Ethics reads in part as follows:

"Conditions of Medical Practice. Section 2. It is unprofessional for a physician to dispose of his services under conditions that make it impossible to render adequate service to his patient or which interfere with reasonable competition among the physicians of a community. * * *

"Contract Practice. Section 3. * * * Contract practice per se is not unethical. However, certain features or conditions if present make a contract unethical,

among which are: * * * 2. When there is underbidding to secure the contract. 3. When the compensation is inadequate to assure good medical service. 4. When there is interference with reasonable competition in a community."

Chapter IX, Article III, Section 1 of the Constitution reads as follows: "It is unprofessional for a physician to dispose of his services under conditions that make it impossible to render adequate service to his patient *or which interfere with reasonable competition among the physicians of a community.*" [Italics supplied]

These provisions were utilized for purposes of disciplinary action against members of the District Medical Society employed by Group Health. Thus, the expulsion of Dr. Scandiffio, a member of the Group Health staff, from the District Medical Society followed a finding of the Compensation, Contract and Industrial Medicine Committee that he was guilty of violating Sections 1 and 2, Article III, and Section 5, Article IV, all of Chapter IX of the Constitution of the Society. That this disciplinary action against members of the Society was intended to affect Group Health Association is shown by the letter of December 10, 1937, sent by the Chairman of the Compensation, Contract and Industrial Medicine Committee of the Society to its Executive Committee which reads as follows: "On November 22nd, 1937, our committee addressed a communication to you advising you of our investigation concerning Drs. Allan E. Lee and M. Scandiffio, and recommended that they be expelled as members of the Society because of their violation of Section 1, Article III, Chapter 9, and Section 5, Article IV, Chapter 9, of the Constitution of the Medical Society of the District of Columbia. Our committee is today in receipt of a letter from Dr. Allan E. Lee, advising us that he has resigned from the staff of Group Health Association. Inasmuch as our recommendation respecting Dr. Lee was based upon the fact that he had entered into a contract with Group Health Association and that contract has now been terminated by him, we feel that no further action should be taken with respect to Dr. Lee. We therefore, respectfully request that the charges and recommendations against Dr. Lee, embodied in our communication of November 22, 1937, be withdrawn and that appropriate action be taken by your committee thereon."

It is shown, also, by the letter of the same Chairman to Dr. Lee under date of December 21, 1937: "In acknowledgment of your letter of December 10, in which you enclose a copy of your resignation as a member of the medical staff of Group Health Association, Inc., may I say that upon receipt of same the Compensation, Contract and Industrial Medicine Committee appeared before the Executive Committee and requested a withdrawal of its charges against you, which request was granted. Such action places your status as that of a member now in good standing."

The concern of the defendants Association and Society with the effect of Group Health on the economic status of the medical profession, and upon competition in financing and making available medical and hospital services, is abundantly illustrated by articles and statements of officers and members thereof. An article, appearing in the Journal of the American Medical Association for October 2, 1937, reads in part as follows: "Out of a total population of 486,869 in the District of Columbia, 115,912 are civil employees of the United States government, and, of these, 2,517 are employees of the Federal Home Loan Bank Board and its affiliated agencies. If to these persons, all of whom are eligible for membership in Group Health Association, their dependents are added, allowing an average of two dependents for each employee, a total of 347,736 persons is reached, out of a total population of 486,869 that the promoters of Group Health Association, according to their certificate of incorporation, seek to withdraw from the ordinary practice of medicine and to cover into a group health insurance contract practice system and treat through physicians hired for that purpose. The effect of the withdrawal from private practice of even one-half that number of persons, all of whom are able to pay for medical services, will materially disturb medical practice in the District of Columbia and react against public interest. * * * The scheme is so planned that the richer and more liberally paid employees are to obtain medical service at rates based on the incomes of the poorest employees. The courts have repeatedly held that the value of medical services rendered to a patient may be properly appraised in relation to his wealth, just as the value of legal services are commonly appraised in relation to the value of the interests that the lawyer is called on to protect, whether interests involving the life of his client or his client's property. Under the present scheme, fees that are charged for medical services to the richer and more liberally paid employees are to be identical with those charged em-

Association was to provide *low-cost medical service,* on a prepayment basis.[24] Appellants, in fact, recognize the existence of a controversy concerning this question.

ployees of the lowest grade, doing part-time work."

The author of this article, who was one of the individual defendants, was Director of the Bureau of Legal Medicine and Legislation of the American Medical Association from 1922 to 1939, when he retired. He holds degrees both of law and of medicine. He was called as a witness by appellants and developed the theme of the article further as follows:

"If GHA expanded its activities to a point where it took over a substantial part of the people of the District of Columbia—rich and poor alike,—the United States Government subsidizing its services—it is quite obvious that the various doctors in the District of Columbia, with their plants, with their experience, and everything else, would not be able to compete on a fair, honest basis; and that is when medical practice would be broken down by the subsidized practice, tending to destroy the medical profession."

The record reveals other similar statements of which the following are examples: "I think it would be exceedingly unfortunate to stabilize the income of the medical profession, because there is just as much difference in the qualifications of doctors as there is in the qualifications of stenographers. Some of them can do it and some of them are rotten. * * * It would be unfortunate to stabilize the pay of doctors."

"* * * let us * * * consider what would happen in the District of Columbia provided you were able to obtain the maximum of enrollment in this corporation. * * * you see what it would do here as an economic thing. * * * It would simply result in the necessary exodus of a large part of the medical profession of the District of Columbia, * * *."

"* * * Quite, naturally, however, the organized profession is insisting upon not being forced by misguided or unfair competition to give up any of its rightful prerogatives."

"The question has many implications. * * * About all the outside doctor would have to do would be to take care of the indigent and the riff-raff and the members who had been dropped by the club."

"Dr. McGovern said that he looked upon this Group Health Association movement as an organization coming in and *interfering with his business.* He added that he expected to be in practice for some 20 years and he did not propose, if it could be avoided at all, to have an organization such as was proposed to interfere with his work and income. 'Just what are you fellows going to do about it?' He cited the instance of the musicians who had succeeded in preventing the Marine Band from cutting in on their business in playing before assemblies without cost to the sponsors. * * * The lawyers as a group had prevented inroads in their business. 'It just doesn't seem that we are active in preventing the National Government from entering the practice of medicine and interfering with our business. It should be demanded from the American Medical Association that they send a man down here now and see just what could be done.'" [Italics supplied]

"*. * * corporation practice of medicine * * * in the District of Columbia threatens to have a far reaching and deleterious effect on the private practice of medicine."

"* * * one is compelled to wonder what will become of the private practice of medicine in those centers if the government is to subsidize cut-rate medical schemes. * * *"

Maintenance of "free and fair competition" was the theme of defendants' request for instruction No. 31, refused by the trial court which read in part: "* * * the defendants were entitled, both collectively and individually, to adopt and carry out reasonable regulations in professional practice for the purpose of maintaining free and fair competition in the District of Columbia and * * * any restraints caused thereby upon Group Health Association, Inc., its doctors, members or operations, without more, would not violate the Sherman Act."

24 Group Health Association is described in the indictment as follows: "33. Group Health Association, Inc., was incorporated on February 19, 1937, and authorized to do business under and by virtue of the laws of Congress for the District of Columbia. Said corporation is a non-profit, cooperative association of employees of certain departments in the executive branch of the United States Government employed in the District of Columbia. Most members of Group Health Association, Inc., are embraced within the low income group, over 80% of them earning annual incomes of not more than $2,000. Said corporation is engaged in the District of Columbia in the business of arranging for the provision of medical care and hospitalization to its members and their dependents on a risk sharing prepayment basis. Said

They requested an instruction in which they asserted their right to disapprove the attitude of Group Health Association with respect to low-cost medicine plans.[25] That appellants' attack on Group Health Association was designed to restrain competition is revealed by the following statement in their Reply Brief: "Appellants insist that the origin of GHA is traceable directly to the Twentieth Century Fund, its subsidiary corporations, and others whose purpose was to destroy the private practice of medicine in the District * * * and to establish corporate practice of medicine." If, as appellants thus contend, they believed that the purpose of the Twentieth Century Fund and the purpose of GHA was to destroy the private practice of medicine in the District, by establishing corporate practice of medicine, obviously, the bitterest kind of competition in making available medical and hospital service was under way. If the purpose of appellants was to prevent such competition by the destruction of GHA, obviously that purpose was to restrain trade.[26]

The important question is, therefore, whether the methods used constituted improper restraints of competition, within the meaning of the statute in the trade or commerce of financing and making available all or any of the three several services to which reference has been made. And, as the prosecution in the present case is under Section 3 of the Act no question of the interstate character of that trade or commerce is involved. Appellants urge a number of contentions to negate unlawful restraint. The first of these is that the controversy here involved is a labor dispute; hence that appellants are excluded from the operation of the Sherman Act, by virtue of provisions of the Clayton Act, 38 Stat. 730, and of the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq.

Presumably appellants' contention casts medical doctors in the role of laborers; Group Health in the role of employer; and themselves in the role of labor organizations, or perhaps in a role comparable to that of the New Negro Alliance;[27] all

corporation collects monthly payments in the form of dues from its members. Medical care is provided by a medical staff consisting of salaried general practitioners and specialists engaged in group practice under the sole direction of a medical director. Said corporation pays adequate salaries to the doctors on its medical staff and provides the medical staff with a modern, well equipped clinic, which was opened on November 1, 1937. Said corporation also defrays, within limits, the expenses of hospitalization of its members and their dependents. The personal relationship ordinarily existing between doctor and patient obtains between the doctors on the medical staff of Group Health Association, Inc. and their Group Health Association, Inc. patients."

25 "Evidence has been permitted in this case with respect to the public need or lack of need of so-called low-cost medicine. I charge you that any need, or lack of need, for a low-cost medicine plan, has nothing to do with the right of the defendants to exercise their lawful powers and duties in connection with the practice of the medical profession. The rights of Group Health Association, Inc. are no greater because of an alleged need for low-cost medicine, than if no such need existed. Group Health Association, Inc. had a lawful right to disapprove of what it may have thought was the attitude of the defendants toward low-cost medicine plans, just as the defendants

had an equal right to disapprove of what the defendants thought was the attitude of Group Health Association, Inc. with respect to low-cost medicine plans. Each party to the controversy had the right to further and advance its own opinion in the controversy by all methods of legitimate persuasion and reasoned argument whether applied to members of the medical profession, the Washington hospitals, or the public. Refused. J.M.P."

26 That appellants' attack on Group Health was for the purpose of restraining competition is admitted, by implication, also in their opening brief: " * * that a corporation known as the Twentieth Century Fund with assets of approximately $3,500,000, and whose main objective was to actively promote the organization of group payment agencies, i. e., organizations through which groups of people might obtain all-around medical and hospital care in return for some fixed periodic payments, was subsidizing GHA and enabling it to sell medical services at less than cost for the purpose of destroying the private practice of medicine and to set up in its place or stead a theory of the distribution of medical services advocated by such Fund; that HOLC was diverting Government moneys to subsidize GHA and thereby enabling it to sell medical services at less than cost; * * *." [Italics supplied]

27 New Negro Alliance v. Sanitary Gro-

this on the assumption that medical practice, the furnishing of medical services and the furnishing of hospital services, come within the common law definition of trade; with the consequence, they argue, that a controversy arising between these three groups, or any two of them, concerns "terms or conditions of employment, or * * * the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, * * *." [28] That medical doctors, lawyers, teachers and other professional people can be and are *employed* there is no doubt. Some professional or pseudo-professional groups have organized themselves into unions. Medical societies and bar associations are sometimes referred to by laboring people as "doctors' unions" and "lawyers' unions." But after all it is a *labor dispute* which is the subject of definition and application in these Acts. Although, in the broader sense, all forms of mental and physical exertion may be called labor, even including attendance at a symphony concert or the labor of childbirth; and, al-

though a dispute concerning any form of such labor might perhaps be called a labor dispute, the purpose of Congress seems to have been to describe a more limited range of activity.[29]

The Committee Reports on the Clayton and Norris-LaGuardia Acts indicate that the legislation was enacted in contemplation of disputes between workingmen,[30] or wage earners,[31] or laborers,[32] on the one hand, and aggregated capital, commonly in corporate form, on the other. A physician is not a workman[33] or a laborer,[34] as those words are known to the law, and his compensation is not wages.[35]

The matrix of the controversy must be the employer-employee relationship,[36] although the disputants need not stand in the proximate relation of employer and employee.[37] If physicians employed on the contract basis in industrial medicine should form associations for collective bargaining they might, perhaps, fairly be said to come within the operation of the Norris-LaGuardia and Clayton Acts.[38] Or if the

cery Co., 303 U.S. 552, amended, 304 U.S. 542, 58 S.Ct. 703, 82 L.Ed. 1012.

[28] Norris-LaGuardia Act of March 23, 1932, 47 Stat. 73, 29 U.S.C.A. § 113(c).

[29] Columbia River Packers Ass'n, Inc., v. Hinton, 315 U.S. 143, 62 S.Ct. 520, 86 L.Ed. —; Note, 51 Yale L.J. 1039, 1040-1041.

[30] H.R.Rep. No. 612, 62d Cong., 2d Sess. (1912) 10: "The consensus of judicial view * * * is that *workingmen* may lawfully combine to further their material interests without limit or constraint, and may for that purpose adopt any means or methods which are lawful. It is the enjoyment and exercise of that right and none other that this bill forbids the courts to interfere with." [Italics supplied]

[31] Sen.Rep. No. 163, 72d Cong., 1st Sess. (1932) 9: "The right of *wage earners* to organize and to act jointly in questions affecting wages, conditions of labor, and the welfare of labor generally is conceded and recognized by all students of the subject." [Italics supplied]

[32] Ibid.: "A single *laborer*, standing alone, confronted with such far-reaching, overwhelming concentration of employer power, and compelled to labor for the support of himself and family, is absolutely helpless to negotiate or to exert any influence over the fixing of his wages or the hours and conditions of his labor." [Italics supplied]

[33] Harris v. Mayor and City Council,

151 Md. 11, 17, 133 A. 888, 890; nor is a lawyer, Gay v. Hudson River Elec. Power Co., C.C.N.D.N.Y., 178 F. 499, 502; nor a skilled chemist, Bagnall v. Levinstein, Ltd., [1907] 1 K.B. 531, 540; Note, 129 A.L.R. 990.

[34] Weymouth v. Sanborn, 43 N.H. 171, 173, 80 Am.Dec. 144; nor is a minister, Holy Trinity Church v. United States, 143 U.S. 457, 463, 12 S.Ct. 511, 36 L.Ed. 226; nor a lawyer, Latta v. Lonsdale, 8 Cir., 107 F. 585, 52 L.R.A. 479; nor a teacher, School Dist. No. 94 v. Gautier, 13 Okl. 194, 204, 73 P. 954, 957; nor an actor, Universal Pictures Corp. v. Superior Court, 9 Cal.App.2d 490, 50 P.2d 500, 501, 502.

[35] Magers v. Dunlap, 39 Ill.App. 618, 619; First Nat. Bank v. Barnum, D.C. M.D.Pa., 160 F. 245, 248; Gay v. Hudson River Elec. Power Co., C.C.N.D. N.Y., 178 F. 499, 503; nor the fees of lawyers, First Nat. Bank v. Barnum, supra. Cf. Romans 6:23.

[36] Columbia River Packers Ass'n, Inc., v. Hinton, 315 U.S. 143, 62 S.Ct. 520, 86 L.Ed. 750.

[37] Ibid.; New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, amended, 304 U.S. 542, 58 S.Ct. 703, 82 L.Ed. 1012.

[38] See Associated Press v. National Labor Relations Board, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953. Cf. Michigan Trust Co. v. Grand Rapids Democrat, 113 Mich. 615, 617, 71 N.W. 1102, 1103, 67 Am.St.Rep. 486.

laity were so dominantly organized into consumer cooperatives that it might properly be said of the physician, as of the individual unorganized worker, that he is "commonly helpless * * * to obtain acceptable terms and conditions of employment, * * *" or protection "from the interference, restraint, or coercion of employers of labor, * * *"[39] then possibly the two Acts would be applicable.[40] But, under the actual facts of the present case, even the contracting physicians occupy no such position. For a fixed sum they assumed to render services when needed.[41] In the rendering of those services, when needed, they are not subject to supervision by the Association.[42] Originally independent contractors, they do not lose that status by contracting to perform unsupervised services.[43]

In our opinion, therefore, neither the Clayton Act nor the Norris-LaGuardia Act was intended to cover such a controversy as existed in the present case. The carefully chosen language of the Hutcheson case[44] seems particularly significant in this respect: "The Norris-LaGuardia Act reasserted the original purpose of the Clayton Act by infusing into it the *immunized trade union activities* as redefined by the later Act. In this light § 20 removes all *such allowable conduct* from the taint of being 'violation of any law of the United States,' including the Sherman Law. * * * It was precisely in order to minimize the difficulties to which the general language of the Sherman Law in its application to *workers* had given rise, that Congress cut through all the tangled verbalisms and enumerated concretely the types of activities which had become *familiar incidents of union procedure."*[45] [Italics supplied.] In the Hutcheson case the Court expressly distinguished the situation in which a union acts, not in its own self-interest, but in combination for other purposes, with non-labor groups.[46] It cited as an example United States v. Brims.[47] In the latter case it was held that a conspiracy of manufacturers of millwork, building contractors and union carpenters, to check competition from nonunion made millwork was a violation of the Sherman Act; the conspiracy agreement being that the manufacturers and contractors would employ only union carpenters, who in turn would refuse to install the nonunion millwork. And, in contrast, the Court, in the Hutcheson case, also said: "Clearly, then, the facts here charged constitute lawful conduct under the Clayton Act unless the defendants cannot invoke that Act because *outsiders to the immediate dispute also shared in the conduct."*[48] [Italics supplied] This, it would seem, was also the situation in the New Negro Alliance case.[49] Assum-

[39] Norris-LaGuardia Act of March 23, 1932, 47 Stat. 70, 29 U.S.C.A. § 102.

[40] Columbia River Packers Ass'n, Inc., v. Hinton, 315 U.S. 143, 62 S.Ct. 520, 86 L.Ed. 750.

[41] Jordan v. Group Health Ass'n, 71 App.D.C. 38, 45, 107 F.2d 239, 246.

[42] Group Health Association By-Laws.

[43] Meigs v. United States, D.C.Mass., 30 F.Supp. 68, 69, 70, affirmed, 1 Cir., 115 F.2d 13; Virginia Iron, Coal & Coke Co. v. Odle's Adm'r, 128 Va. 280, 289, 105 S.E. 107, 109. See Cardillo v. Mockabee, 70 App.D.C. 16, 18, 102 F.2d 620, 622.

[44] United States v. Hutcheson, 312 U.S. 219, 227, 231, 61 S.Ct. 463, 464, 85 L.Ed. 788: "Whether the use of conventional, peaceful activities by a union in controversy with a rival union over certain jobs is a violation of the Sherman Law, Act of July 2, 1890, 26 Stat. 209, as amended, 15 U.S.C. § 1 [15 U.S.C.A. § 1], is the question. * * * The Norris-LaGuardia Act removed the fetters upon *trade union activities*, which according to judicial construction § 20 of the Clayton Act [29 U.S.C.A. § 52] had left untouched, by still further narrowing the circumstances under which the federal courts could grant injunctions in labor disputes. More especially, the Act explicitly formulated the 'public policy of the United States' in regard to the industrial conflict, and by its light established that the allowable area of *union activity* was not to be restricted, as it had been in the Duplex case, to an immediate employer-employee relation. Therefore, whether *trade union conduct* constitutes a violation of the Sherman Law is to be determined only by reading the Sherman Law and § 20 of the Clayton Act and the Norris-LaGuardia Act as a harmonizing text of outlawry of labor conduct." [Italics supplied]

[45] Id., 312 U.S. at pages 236, 237, 61 S.Ct. at page 468, 85 L.Ed. 788.

[46] United States v. Hutcheson, 312 U.S. 219, 232, 61 S.Ct. 463, 85 L.Ed. 788.

[47] 272 U.S. 549, 47 S.Ct. 169, 71 L.Ed. 403.

[48] United States v. Hutcheson, 312 U.S. 219, 233, 61 S.Ct. 463, 85 L.Ed. 788.

[49] New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 555, 556, amended, 304 U.S. 542, 58 S.Ct. 703, 82 L.Ed. 1012; Columbia River Packers Ass'n,

ing a bona fide labor dispute, the participation of a non-labor organization therein should not, without more, deprive it of its character as a labor dispute; give it the character of criminal conduct; or authorize judicial restraint except in compliance with the limitations of the Norris-LaGuardia Act.

But, under the circumstances of the present case, appellants cannot escape the proscriptions of the Sherman Act even if we assume that the controversy was a labor dispute. As we have already noticed, the Supreme Court plainly indicated in the Apex case [50] that some phases of labor disputes may come under the condemnation of the Sherman Act; if, for example, they involve a combination or conspiracy which has as its purpose restraint upon competition, or if the labor organization is used by combinations of those engaged in an industry as the means or instrument for suppressing competition or fixing prices.[51] In the Apex case the Sherman Act was held to be inapplicable because it did not appear that the strikers' acts were intended to restrain competition or that they had any effect on market prices of goods or services.[52] But that was not the situation of the present case.

■ Appellants reassert—in support of their contention that their conduct was not in restraint of trade—a proposition urged on the earlier appeal, that their conduct was no more than a reasonable regulation of the practice of medicine; and they rely upon the language of our earlier opinion: "If there is any justification for the restraint, so as to make it reasonable as a regulation of professional practice, it must be shown in evidence as a defense * * *." [53] But in that same opinion—after recognizing the large and beneficent part which appellants have played in raising the standards of medical practice, and in contributing to the relief of the unfortunate and destitute—we also said: "Notwithstanding these important considerations, it cannot be admitted that the medical profession may through its great medical societies, either by rule or disciplinary proceedings, legally effectuate restraints as far reaching as those now charged."[54] And we did not, by any means, declare the law to be—as appellants now assert—that a conspiracy "entered into with the object of properly and fairly regulating the practice of medicine, * * *" was not a violation of the Sherman Act. The prayer for instruction which appellants requested upon this point was contradictory on its face and was properly refused.[54a] Under no circumstances could the commission of crime be justified as a reasonable regulation of professional practice.[55]

---

Inc., v. Hinton, 315 U.S. 143, 62 S.Ct. 520, 86 L.Ed. 750.

[50] Apex Hosiery Co. v. Leader, 310 U.S. 469, 487-489, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044.

[51] Id., 310 U.S. at page 501, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044. See New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 562, 563, amended, 304 U.S. 542, 58 S.Ct. 703, 708, 82 L.Ed. 1012: " * * * short of fraud, breach of the peace, violence, or conduct otherwise unlawful. * * *"; United States v. Hutcheson, 312 U.S. 219, 231, 61 S.Ct. 463, 466, 85 L.Ed. 788: "Therefore, whether trade union conduct constitutes a violation of the Sherman Law is to be determined only by reading the Sherman Law and § 20 of the Clayton Act and the Norris-LaGuardia Act as a harmonizing text of outlawry of labor conduct."

[52] Apex Hosiery Co. v. Leader, 310 U.S. 469, 501, 502, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044.

[53] United States v. American Medical Ass'n, 72 App.D.C. 12, 21, 110 F.2d 703, 712, certiorari denied 310 U.S. 644, 60 S.Ct. 1096, 84 L.Ed. 1411.

[54] Ibid.

[54a] The requested instruction reads as follows:

"The jury is instructed as a matter of law that not all combinations and agreements affecting trade in the District of Columbia are condemned by the Sherman Act.

Where a combination or conspiracy was entered into with the object of properly and fairly regulating the practice of medicine in which the defendants are engaged or interested, such combinations or conspiracies are not a violation of Section 3 of the Sherman Act. If the jury finds from the evidence that the alleged combination or conspiracy was a reasonable regulation of the practice of medicine and further finds that the effect of its formation and enforcement on trade in the District of Columbia is but indirect and not its purpose or object, then a verdict of 'Not Guilty' must be returned as to all of the defendants."

[55] In Anderson v. United States, 171 U.S. 604, 615, 616, 19 S.Ct. 50, 54, 43 L.Ed. 300, upon which appellants rely, the law was stated in the following terms: "Where the subject-matter of

■ The wide scope of appellants' contention concerning their power to effect a reasonable regulation of the practice of medicine is revealed by proposed instructions and by their arguments on brief which seem to assume for them powers of a state legislature to enact and enforce laws to require improvement of standards of professional practice. Thus they rely upon such cases as Semler v. Oregon State Board of Dental Examiners [56] and Graves v. State of Minnesota,[57] which involved the constitutionality of state statutes and in each of which the statute was upheld on the ground that it constituted a reasonable exercise of the police power of the state. Needless to say, appellants have no such power.

■ The situation which confronts appellants, and which they have sought to control, is not confined to the medical profession alone. Profound changes in social and economic conditions have forced members of all professional groups to make readjustments. The fact that these changes may result even in depriving professional people of opportunities formerly open to them does not justify or excuse their use of criminal methods to prevent changes or to destroy new institutions. Lawyers, too, have seen, during recent decades, large scale changes in their professional work. [58] There was a time when lawyers worked entirely on fee or retainer in particular cases and controversies; now many of them are salaried employees on the staffs of large corporate industrial and financial organizations. Many of the simpler functions of business which once required the assistance of lawyers are now the routine work of better educated and more highly skilled business men; some of them law school graduates. Recent legislation has had the effect of removing from the field of judicial controversy and determination, a large percentage of cases which at an earlier time constituted the mainstay of lawyers' practice. [59] A good example is found in connection with accidents occurring in industrial employment. In some of this new legislation representation by lawyers is expressly discouraged. [60] In some of it, formal rules of pleading, practice and evidence—the lawyers' tools—are dispensed with. [61] There are some who regret and some who resent these changes. Over the years, as individuals and as members of professional associa-

the agreement does not directly relate to and act upon and embrace interstate commerce, and where the undisputed facts clearly show that the purpose of the agreement was not to regulate, obstruct, or restrain that commerce, but that it was entered into with the object of properly and fairly regulating the transaction of the business in which the parties to the agreement were engaged, such agreement will be upheld as not within the statute, where it can be seen that the character and terms of the agreement are well calculated to attain the purpose for which it was formed, and where the effect of its formation and enforcement upon interstate trade or commerce is, in any event, but indirect and incidental, and not its purpose or object."

[56] 294 U.S. 608, 55 S.Ct. 570, 79 L.Ed. 1086.

[57] 272 U.S. 425, 47 S.Ct. 122, 71 L.Ed. 331.

[58] Jackson, An Organized American Bar, 18 A.B.A.J. 383; Rutledge, What Changed Conditions Must the Lawyer Face in the Practice of Law?, 9 Am.L. School Rev. 1174.

[59] See Llewellyn, The Bar's Troubles, and Poultices—and Cures?, 5 Law and Contemp. Prob. 104, 107.

[60] E. g., the Longshoremen's and Harbor Workers' Compensation Act of March 4, 1927, 44 Stat. 1435, 33 U.S.C. A. § 919(d): "At such hearing the claimant and the employer may each present evidence in respect of such claim and may be represented by any person authorized in writing for such purpose."

The legislation establishing a Small Claims and Conciliation Branch in the Municipal Court of the District of Columbia provides in part that "The clerk of said branch shall, at the request of any individual, prepare the statement of claim and other papers required to be filed in an action in this branch. * * *" 52 Stat. 103, § 5(a), D.C.Code (1940) § 11—805(a).

See Eagle Indemnity Co. v. Industrial Accident Commission, 217 Cal. 244, 248, 18 P.2d 341, 343; Note, 22 Calif.L. Rev. 121; Robinson, Appearances by Laymen in a Representative Capacity before Administrative Bodies, 5 Law and Contemp. Prob. 89.

[61] E. g., the Longshoremen's and Harbor Workers' Compensation Act of March 4, 1927, 44 Stat. 1437, 33 U.S. C.A. § 923(a): "In making an investigation or inquiry or conducting a hearing the deputy commissioner shall not be bound by common law or statutory rules of evidence or by technical or formal rules of procedure, except as provided by this Act [chapter]; but may make such investigation or inquiry or conduct

tions, they have labored to prevent or minimize them. But they would not suggest that criminal conduct, as individuals or as associations, would be proper for such a purpose.

█ Professions exist because the people believe they will be better served by licensing especially prepared experts to minister to their needs. [62] The licensed monopolies which professions enjoy constitute, in themselves, severe restraints upon competition. But they are restraints which depend upon capacity and training, not special privilege. Neither do they justify concerted criminal action to prevent the people from developing new methods of serving their needs. There is sufficient historical evidence of professional inadequacy to justify occasional popular protests. [63] The better educated laity of today questions the adequacy of present-day medicine. [64] Their challenge finds support, as indicated in the margin, from substantial portions of the medical profession itself. [65] The people give the privilege of professional monopoly and the people may take it away.

---

such hearing in such manner as to best ascertain the rights of the parties."

In proceedings in the Small Claims and Conciliation Branch of the Municipal Court, "The judge shall conduct the trial in such manner as to do substantial justice between the parties according to the rules of substantive law, and shall not be bound by the statutory provisions or rules of practice, procedure, pleading, or evidence, except such provisions relating to privileged communications." 52 Stat. 105, § 8(b), D.C.Code (1940) § 11—808(b).

[62] Alabama Power Co. v. Federal Power Commission, 75 U.S.App.D.C. 315, 128 F.2d 280, decided March 30, 1942: " 'The grant of a license, being a privilege from the sovereign, can be justified only on the theory of resulting benefit to the public. * * * ' "

[63] Shryock, The Development of Modern Medicine (1936) 2: "When Rush died, in 1813, he was widely acclaimed the greatest physician his country had known. Three short decades passed, and an outstanding American physician of the next generation found himself revaluing Rush's medical essays. The results were rather startling. 'It may be safely said,' observed Elisha Bartlett in 1843, 'that in the whole vast compass of medical literature, there cannot be found an equal number of pages containing a greater amount and variety of utter nonsense and unqualified absurdity.' A more sudden and extreme revision of scientific opinion could hardly be imagined. Here was Rush lauded by one generation and repudiated by the next."

[64] Shryock, id. at 371-372: "Hence there gradually evolved, in educated minds, a syllogism of some such form as this: Medical science can now prevent or cure certain major diseases. Many people continue to suffer from these very diseases. Ergo, medical science does not serve the people as it should. The most obvious explanation was to be found in the mounting costs of service.

Here, again, it is to be noted that it was the very progress which physicians had made in science, which involved them in new difficulties in the practice of their art. Technical improvement led to simultaneous increase in the demand for medical services and in the price that must be paid for them. And so the more that people trusted medical aid, the less they could afford it. Here was a serious and unexpected impasse in the public relations of the profession."

[65] Shryock, id. at 399-400: "In 1926 some fifteen leaders in medicine, public health, and the social sciences had inaugurated a series of conferences which led to the creation of a national Committee on the Costs of Medical Care. This body consisted of fifty members drawn from various interested groups ranging from private practitioners to economists. Dr. Ray Lyman Wilbur, Secretary of the Interior in President Hoover's cabinet, served as Chairman. * * * The Committee carried out a nation-wide survey of sickness and medical service among nearly nine thousand white families. Their reports revealed, by 1932, a direct correlation between income and all types of medical service; and tended in general to substantiate the claims made by the advocates of health insurance more than a decade before. The lowest income group (under $1,200 per year) received more of certain types of care—presumably due to charity services—than did the next two higher groups ($1,200 to $3,000); but in general these classes all received much less service than those whose incomes were above the last-named amount. Thus the group with the lowest amount of service received only 50 per cent as many days of hospitalization, and only 41 per cent as many medical calls as did the group with the highest amount of service. In every case, the latter was the highest income group. The highest group itself received less medical service than the standard which the majority of

A highly regimented military profession under strict governmental control; a ministerial or religious profession, without uniform standards or licensure; a large group of highly trained persons who serve the people as experts in news collection and dissemination but who have never had professional standing, licensure or monopoly;[66] these are all examples of alternative methods which the people have used to develop and control their professional groups. In some instances professional groups have been charged by legislative fiat with powers and duties concerning professional education, licensure, discipline, removal of licensees from practice, and other related subjects.[67] In such cases they act as agencies of government. Although some similar delegations of power have been made to the organized medical profession,[68] there is no evidence of delegation of power to appellants, sufficient to authorize the conduct for which they have been convicted. In the absence thereof professional groups must abide by the general laws just as scrupulously as any private citizen or

---

the Committee considered essential to good care."

The American Medical Association, it is true, disagrees with the conclusions of these eminent professionals. Shryock, id. at 401: "Taking quite another view of the situation, the Bureau of Economics of the American Medical Association conducted an investigation which ' * * * revealed the fact that there are few, if any, people in the United States really suffering from lack of medical care. * * * '"

[66] It is perhaps significant that in the latest professional development—radio broadcasting—increased emphasis has been placed on ruthless competition (Federal Communications Commission v. Sanders Brothers Radio Station, 309 U. S. 470, 642, 60 S.Ct. 693, 84 L.Ed. 869, 1037) and governmental control. Federal Communications Act of 1934, 48 Stat. 1082-1087, 47 U.S.C.A. §§ 303(m), 304, 307(d), 309(b) (1), 311, 312(a) (b); id. 48 Stat. 1104, 47 U.S.C.A. § 606(c) (d), as amended by the Act of January 26, 1942, Public No. 413, 77th Cong., 2d Sess.

[67] E.g., the Integrated Bar in the legal profession. The State Bar Act of South Dakota provides in part (South Dakota Laws 1931, c. 84, §§ 11, 13; 14 J.Am. Jud.Soc. 188, 189): "Section 11. Unlawful Practice of Law. After the organization of the State Bar has been accomplished, as provided by this act, the Supreme Court shall fix a date after which no person shall practice law in the State of South Dakota unless such person be a member of the State Bar in good standing. * * * "

"Section 13. Violation of Rules May Be Punished. The by-laws, rules and regulations, when adopted by the Bar Board and when approved by the Supreme Court, shall be binding upon all members of the State Bar, and the wilful violation of any such rules and regulations by any member of the State Bar may be punished by suspension from the practice of law, for such period as may be determined by the Supreme Court under the same procedure as now provided by law for suspension of the right of attorneys to practice law in this state."

The State Bar Act of California provides in part (California Statutes 1927, c. 34, p. 38, §§ 23, 24, 26): "Sec. 23. The board shall have power to aid in the advance of the science of jurisprudence and in the improvement of the administration of justice."

"Sec. 24. With the approval of the supreme court, and subject to the provisions of this act, the board shall have power to fix and determine the qualifications for admission to practice law in this state. * * * "

"Sec. 26. The board of governors shall have power, after a hearing for any of the causes set forth in the laws of the State of California warranting disbarment or suspension, to disbar members or to discipline them by reproval, public or private, or by suspension from practice, and the board shall have power to pass upon all petitions for reinstatement. * * * "

See Sayre, Proposed Integration of the Bar in Iowa, 17 Iowa L.Rev. 50, 53, n. 5. For general discussion see Report of the Special Committee on Incorporation of the Bar, 11 Mich.State Bar Journal 50*.

[68] E.g., in Maryland the examination of applicants for licenses to practice is entrusted to a Board of Medical Examiners elected by the state medical society, the Medical and Chirurgical Faculty. Md. Code (1939) art. 43, § 117. The Board is charged to establish its own standard of requirements for examinations (Id. § 120), and all licenses to practice are to have affixed the seal of the Medical and Chirurgical Faculty. Id. § 126.

The educational standards established by the American Medical Association for medical schools are sometimes given legislative recognition in statutes providing for the granting of certificates to prac-

private corporation. It is in this setting that appellants were permitted to organize, to establish standards of professional conduct, to effect agreements for *self-discipline and control*. There is a very real difference between the use of such self-disciplines and an effort upon the part of such associations to destroy competing professional or business groups or organizations. Again, to use the analogy of the legal profession, the activities of the American Medical Association in the present case more nearly resemble the situation which would exist if the American Bar Association or one of the state associations should undertake to destroy, by methods of criminal conspiracy, business organizations which employ lawyers, such as automobile associations, collection agencies, bankers' associations and title and trust companies. It is true that they have attempted, by means of actions to forbid unlawful practice of the law and by efforts to secure legislation, thus to prevent activities which they regarded as encroachments upon the practice of law. Such actions at law and such efforts to secure enactment of legislation are equally available to appellants. But there is a clearly defined line of demarcation here which must be observed if the penalties of the Sherman Act are to be avoided. As we suggested in our earlier opinion, appellants have open to them always the safer and more kindly weapons of legitimate persuasion and reasoned argument, [69] as a

means of preserving professional esprit de corps, winning public sentiment to their point of view or securing legislation. [70] But they have no license to commit crime. When they go so far as to impose unreasonable restraints, they become subject to the prohibition of the Sherman Act. [71] This, then, represents a limit to professional group activities. If it is desired to extend them beyond this point, legislation is required for that purpose. It may be desirable that this professional group shall be given such enlarged powers, but if so it will be necessary for the legislature to speak upon the subject rather than for the courts to recognize a privilege based upon preemption or usurpation.

The same general misconception seems to underlie appellants' effort to show absence of restraint by contending that Group Health Association is an illegal organization or that it is engaged in illegal activities. It is elementary that a person is not privileged to kill another simply because the latter is a bad man. [72] Neither can justification for the commission of a crime be found in the fact that its commission benefited the community; and evidence offered for such a purpose is properly excluded. [73] Nor is the fact that a crime was committed with the intent to accomplish some ultimate good, an excuse for its commission; [74] even if it was for the purpose of enforcing the law.[75]

---

tice to graduates of foreign schools which maintain such standards. Va. Code (1936) c. 68, § 1615(d).

The high standards adopted by the medical profession have also been recognized by state laws permitting the admission to practice of licentiates of the National Board of Medical Examiners. Md.Code (1939) art. 43, § 121; Ga. Code (1933) § 84-914. See 119 A.M.A. J. 178 (May 9, 1942).

[69] United States v. American Medical Ass'n, 72 App.D.C. 12, 21, 110 F.2d 703, 712, certiorari denied 310 U.S. 644, 60 S. Ct. 1096, 84 L.Ed. 1411.

[70] Henderson v. City of Knoxville, 157 Tenn. 477, 481, 9 S.W.2d 697, 698, 60 A.L.R. 652, 654.

[71] Sugar Institute, Inc. v. United States, 297 U.S. 553, 597-600, 56 S.Ct. 629, 80 L.Ed. 859.

[72] State v. Morrison, 121 S.C. 11, 113 S.E. 304.

[73] Respublica v. Caldwell, 1 Dall., Pa., 150, 1 L.Ed. 77.

[74] People ex rel. Hegeman v. Corrigan, 195 N.Y. 1, 13, 87 N.E. 792, 796: "So,

ordinarily, a criminal intent is an intent to do knowingly and willfully that which is condemned as wrong by the law and common morality of the country, and if such an intent exists, it is neither justification nor excuse that the actor intended by its commission to accomplish some ultimate good. 1 Bishop's Crim. Law, § 341. * * * One may not commit a crime because he hopes or expects that good will come of it. It is no defense to a charge of intentionally committing an act prohibited by law even that the dictates of his religious belief require one to do the act."; Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244.

[75] Crawford v. Ferguson, 5 Okl.Cr. 377, 115 P. 278, 279, 280, 45 L.R.A.,N.S., 519: "A violation of law, when committed even for the purpose of enforcing the law, is not only illegal, but it is anarchy itself."; Hamp v. State, 19 Wyo. 377, 406, 118 P. 653, 662; Charge to the Grand Jury, Quincy, [Mass.] 218, 221: "Levying War against the King is High Treason; as where People set about redressing public Wrongs; this, Gentle-

■ The same rule applies in conspiracy cases as in criminal cases generally. Thus it was no defense to a charge of conspiracy to dynamite a man's house that the house was a disreputable resort, a place where moonshine whisky was sold and where lewd women congregated for unlawful purposes. [76] And the same rule applies in cases of conspiracy under the Sherman Act. [77] Neither the fact that the conspiracy may be intended to promote the public welfare, [78] or that of the industry, [79] nor the fact that it is designed to eliminate unfair, fraudulent and unlawful practices, [80] is sufficient to avoid the penalties of the Sherman Act.

■ Appellants are not law enforcement agencies; they are charged with no duties of investigating or prosecuting, to say nothing of convicting and punishing.

They have been given no power to require their members, or Group Health Association, to reveal the intimate details of their affairs, as was attempted in the present case. [81] Except for their size, their prestige and their otherwise commendable activities, their conduct in the present case differs not at all from that of any other extra-governmental agency which assumes power to challenge alleged wrongdoing by taking the law into its own hands. [82] Although extreme situations may seem sometimes to have required vigilante action where effective law enforcement by duly constituted officers had broken down or never been established; [83] and although persons who reason superficially concerning such matters may find justification for extra-legal action to secure what seems to them desirable ends; this is not the American way of life. [84] If Group Health

men, the Law calls levying War against the King; because it is going in direct Opposition to the King's Authority, who is the Redresser of all Wrongs."

[76] Nails v. Commonwealth, 228 Ky. 838, 16 S.W.2d 474.

[77] Sugar Institute, Inc., v. United States, 297 U.S. 553, 599, 56 S.Ct. 629, 642, 80 L.Ed. 859: "The freedom of concerted action to improve conditions has an obvious limitation. The end does not justify illegal means. The endeavor to put a stop to illicit practices must not itself become illicit. As the statute draws the line at unreasonable restraints, a cooperative endeavor which transgresses that line cannot justify itself by pointing to evils afflicting the industry or to a laudable purpose to remove them."; Paramount Famous Lasky Corp. v. United States, 282 U.S. 30, 44, 51 S.Ct. 42, 75 L.Ed. 145.

[78] Eastern States Retail Lumber Dealers' Ass'n. v. United States, 234 U.S. 600, 613, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A. 1915A, 788.

[79] Paramount Famous Lasky Corp. v. United States, 282 U.S. 30, 43, 51 S.Ct. 42, 75 L.Ed. 145; United States v. First National Pictures, Inc., 282 U.S. 44, 51 S.Ct. 45, 75 L.Ed. 151.

[80] Fashion Originators' Guild of America, Inc. v. Federal Trade Commission, 312 U.S. 457, 468, 668, 61 S.Ct. 703, 85 L.Ed. 949.

[81] United States v. American Linseed Oil Co., 262 U.S. 371, 389, 43 S.Ct. 607, 67 L.Ed. 1035.

[82] Fashion Originators' Guild of America, Inc., v. Federal Trade Commission, 312 U.S. 457, 465, 466, 668, 61 S.Ct. 703,

707, 85 L.Ed. 949: "In addition to all this, the combination is in reality an extra-governmental agency, which prescribes rules for the regulation and restraint of interstate commerce, and provides extra-judicial tribunals for determination and punishment of violations, and thus 'trenches upon the power of the national legislature and violates the statute.' Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 242 [20 S. Ct. 96, 107, 44 L.Ed. 136]."

[83] 23 Encyc. Brit. 146. See Denver and Rio Grande Ry. v. Harris, 122 U.S. 597, 606, 7 S.Ct. 1286, 30 L.Ed. 1146; Boyle v. Case, C.C.Or., 18 F. 880, 883-885; Saunders v. Gilbert, 156 N.C. 463, 481, 72 S.E. 610, 617, 38 L.R.A.,N.S., 404.

[84] Charles Evans Hughes, 18 Proc. of Am. Law Inst. (1941) 24, 29: "Democracy cannot escape its pressure groups. Each interest has its imperious demands. These groups compete in the market place, in the forums of public opinion, in popular elections, and in our legislative halls, but they have no place in the halls of judicial administration. The lamps of justice are dimmed or have wholly gone out in many parts of the earth, but these lights are still shining brightly here. We are engaged in harnessing our national power for the defense of our way of life. But that way is worthwhile only because it is the pathway of the just. It is our high privilege, although our task may seem prosaic, to strengthen the defenses of democracy by commending to public confidence and esteem the working of the institutions of justice in both state and nation."; Note, 2 Geo.Wash.L.Rev. 498.

Association is illegal, or is engaged in illegal activities, there is a method provided by law to determine the facts and to secure appropriate action.[85] If further controls are needed in addition to those now available, the legislative method is the appropriate one to secure the desired end.

The Government offered evidence that in various instances, over a period of years preceding the indictment, the American Medical Association induced various hospitals to exclude physicians from their staffs because of the physicians' connection with various low-cost, risk-sharing or prepayment plans for medical services. Appellants contend that this evidence was not the type of background evidence approved by our decision in United States v. American Medical Association.[86] Specifically, they object that the Government did not present in detail the nature of the various plans which the Association thus allegedly sought to thwart and that the action of the Association is equivocal, hence as consistent with the enforcement of legitimate ethical standards as with a policy of discouragement of low-cost or risk-sharing or prepayment plans. It is true that in each instance the nature of the plan was not greatly detailed, though the Government's first witness gave a description of prepayment plans in general and described several then in operation, including at least two which were objects of opposition by the Association. We think it was sufficiently shown that these various plans all involved the common element of low cost, and that the attitude of the Association toward each was hostile.[87] This evidence was admissible as bearing on the intent of

---

[85] D.C.Code (1940) §§ 2—101, 2—102, 2—130, 2—132, 2—137, 29—719, 29—725, 35—1347. Proceedings instituted by Group Health Association have established that its activities do not violate the insurance laws of the District of Columbia. Jordan v. Group Health Ass'n, 71 App.D.C. 38, 107 F.2d 239. The decision of the District Court included a finding that Group Health's activities do not violate the Healing Arts Practice Act of the District of Columbia. Group Health Ass'n. v. Moor, D.C., 24 F.Supp. 445, 446, 447. This part of the judgment was not appealed. Jordan v. Group Health Ass'n, 71 App.D.C. 38, 39, 107 F.2d 239, 240.

[86] 72 App.D.C. 12, 110 F.2d 703, certiorari denied 310 U.S. 644, 60 S.Ct. 1096, 84 L.Ed. 1411.

[87] For example, in 1936, the State Medical Society of Wisconsin disapproved a plan proposed for the care of employees of the International Harvester Company. The proponents of this plan, who were members of the State Society, refused to resign, and were subsequently tried, found guilty and expelled from the Society on the ground of violations of the By-Laws of the Society and the Principles of Medical Ethics. The expelled members appealed to the Judicial Council of the American Medical Association, which affirmed the action of the State Society. As appears from the opinion of the Judicial Council, the features of the plan were as follows: "1. Unlimited medical and surgical service for $1.00 per month for a single man; $2.00 per month for man and wife; $3.00 per month for man, wife and family. 2. Only diseases excluded from the plan—mental and contagious. Hospitalization not included. 3. There would be no solicitation of patients. 4. All physicians who joined the clinic would benefit from any profits. 5. Patients may select any physician on the staff. 6. Preventive treatment not included in the plan. 7. No written contract between patient and clinic. Participants in plan restricted to those with income of $200.00 or less per month."

The opinion of the Judicial Council also stated that: "The Judicial Council is distinctly of the opinion that practice under the terms and conditions to which these appellants have agreed with the employees of the International Harvester Company constitutes a violation of Chapter III, Art. VI, (Revised) Sec. 3, of the Principles of Medical Ethics (contract practice contrary to sound public policy)."

In the meantime and following the action of the State Society, Dr. Cutter, Secretary of the Association, had written the Superintendent of Mount Sinai Hospital, Milwaukee, Wisconsin, in the following language: "It has come to our attention, through correspondence with the Medical Society of Milwaukee County, that certain physicians have been expelled from that society through participation in an organization known as 'Milwaukee Medical Center.' It is also reported that certain of these same individuals continue as members of your attending staff with hospital privileges. May we call your attention to the recent resolution passed by the House of Delegates of the American Medical Association, as follows: 'Resolved, That it is the opinion of the House of Delegates of the American Medical Association that physicians on the staffs of hospitals ap-

the Association in respect of the actions which are the subject matter of the indictment.[88] Even assuming that this evidence may have been relevant only in respect of the American Medical Association and that it was introduced for that purpose by the Government, nevertheless, as appellants sought only to exclude it entirely, rather than merely to limit its probative force, there was, consequently, no error in admitting it, [89] in any event.

▮▮▮▮▮ Appellants contend further, in this connection, that: "A misdemeanor such as described in Section 3 of the Sherman Act is not a violation of the law in Texas, Wisconsin, or any other state of the United States. A restraint of intrastate trade in Texas or Wisconsin is not a violation of any law of the United States, and so far as this record discloses, of any state law. Every man has a right to do it, and no finger of scorn is to be pointed at him for doing it. To permit the Government to prove in a case pending in the District of Columbia lawful acts that were performed by the defendant AMA in Texas and Wisconsin is error." But as applied to the present case the premise is incorrect and the conclusion does not follow. In the first place, it is elementary that if the object of a conspiracy is criminal, then evidence of conduct—otherwise lawful—but which is intended to achieve that criminal objective may properly be received to prove the conspiracy.[90] In the second place, whether the particular conduct was criminal at the time and place where it occurred is beside the point. Evidence has been admitted to prove background, even though it concerned conduct which occurred prior to adoption of the act under which the indictment was found;[91] as well as concerning conduct which occurred before the date

proved for intern training by the Council on Medical Education and Hospitals should be limited to members in good standing of their local county medical societies and that the House of Delegates requests the Council on Medical Education and Hospitals to take this under advisement.' What possibility, if any, exists for observance of the principle laid down in this resolution?"

After a series of temporizing correspondence, Dr. Cutter again addressed the Superintendent of Mount Sinai Hospital as follows: "In view of the fact that we have received no reply to our letter of May 5 and no notification of any action taken with respect to the employment of physicians expelled from the county medical society, we wish to inform you that we are recommending to the Council that Mount Sinai Hospital be removed from the approved intern list and also from the Register of the American Medical Association."

One week later the Superintendent of Mount Sinai Hospital wrote Dr. Cutter that the objectionable physicians had been denied further staff and courtesy privileges at Mount Sinai Hospital by vote of the Executive Committee.

88 Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683; Standard Oil Co. v. United States, 221 U.S. 1, 46, 47, 75-77, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734; Heike v. United States, 227 U.S. 131, 145, 33 S.Ct. 226, 57 L.Ed. 450; Baush Machine Tool Co. v. Aluminum Co. of America, 2 Cir., 72 F.2d 236, 239, certiorari denied 293 U.S. 589, 55 S.Ct. 104, 79 L.Ed. 683; Pat-

terson v. United States, 6 Cir., 222 F. 599, 629, 630, certiorari denied 238 U.S. 635, 35 S.Ct. 939, 59 L.Ed. 1499; United States v. Lake Shore & M. S. Ry., D.C.S.D.Ohio, 203 F. 295, 307, appeal dismissed 241 U.S. 691, 36 S.Ct. 721, 60 L.Ed. 1238; United States v. E. I. Du Pont de Nemours & Co., C.C.Del., 188 F. 127, 134.

89 Greater New York Live Poultry Chamber of Commerce v. United States, 2 Cir., 47 F.2d 156, 159, certiorari denied 283 U.S. 837, 51 S.Ct. 486, 75 L. Ed. 1448.

90 Aikens v. State of Wisconsin, 195 U. S. 194, 206, 25 S.Ct. 3, 49 L.Ed. 154; Swift & Co. v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518; Badders v. United States, 240 U.S. 391, 394, 36 S.Ct. 367, 60 L.Ed. 706; Duplex Printing Press Co. v. Deering, 254 U.S. 443, 465, 41 S.Ct. 172, 66 L.Ed. 349, 16 A.L.R. 196; Falstaff Brewing Corp. v. Iowa Fruit & Produce Co., 8 Cir., 112 F.2d 101, 108; Lynch v. Magnavox Co., 9 Cir., 94 F.2d 883, 889; Marino v. United States, 9 Cir., 91 F.2d 691, 694, 113 A. L.R. 975, certiorari denied Gullo v. United States, 302 U.S. 764, 58 S.Ct. 410, 82 L.Ed. 593.

91 Standard Oil Co. v. United States, 221 U.S. 1, 46, 47, 31 S.Ct. 502, 510, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann. Cas.1912D, 734: " * * * it tended to throw light upon the acts done after the passage of the anti-trust act and the results of which it was charged were being participated in and enjoyed by the alleged combination at the time of the filing of the bill."

in the indictment when it was alleged that the accused persons conspired.[92] The disputed evidence in the present case was not offered to prove the commission of crimes in Texas, Wisconsin, or other states, but to prove the commission of a crime in the District of Columbia, by proving the background of appellant's conduct in the District of Columbia. What it did in the District was part of a larger plan. Evidence of conduct in other states—which may have been perfectly lawful according to the laws in force in those states—was nevertheless proof of appellant's intent and purpose in acting as it did in the District.[93] The cases relied upon by appellants require no other conclusion. One of them is not in point and in both of the others all the acts complained of were committed outside the United States.[94] In Eastern States Petroleum Co., Inc., v. Asiatic Petroleum Corp., Judge Chase, speaking for the Second Circuit Court of Appeals, put the case in a nutshell when he said: "Likewise, what was done wholly abroad *unaided by acts in this country* must be counted out."[95] [Italics supplied.]

Appellants contend that the verdict of the jury acquitting all the defendants except the American Medical Association and the Medical Society of the District of Columbia, and convicting the two latter associations, constitutes such inconsistency as to require that the verdicts

of guilty be set aside. It has been held many times that inconsistency in verdicts does not require the result contended for by appellants.[96] And this is true even though the inconsistency can be explained by no rational considerations.[97] The question for us is whether the convictions are consistent with the evidence.[98] Complete identity of participation in the conspiracy was not necessary upon the part of the participants, either in fact or in law. While such complete identity is not necessary in order to sustain a verdict when several persons jointly tried are convicted,[99] lack of it may be enough to explain away a supposed inconsistency when some are acquitted and others convicted. Thus in American Socialist Soc. v. United States, the court said: "The last objection is that the judgment should be reversed, because, if the author of the pamphlet was not guilty, the publishers could not be guilty. It is said that Nearing must have been acquitted on one of two grounds, viz. either that the pamphlet itself was innocuous or that he had no intent to obstruct the recruiting and enlistment service of the United States. If the acquittal of Nearing was on the first ground, the society ought also to have been acquitted. We are therefore justified in finding that the acquittal was on the second ground. The statute, in defining the offense, imposes the additional condition that the act

[92] Heike v. United States, 227 U.S. 131, 145, 33 S.Ct. 226, 229, 57 L.Ed. 450: "The longer it had lasted the greater the probability that he knew of it, and that his acts that helped it were done with knowledge of their effect."; Baush Machine Tool Co. v. Aluminum Co. of America, 2 Cir., 72 F.2d 236, 239, certiorari denied 293 U.S. 589, 55 S.Ct. 104, 79 L.Ed. 683; Wilson v. United States, 6 Cir., 109 F.2d 895.

[93] See Greater New York Live Poultry Chamber of Commerce v. United States, 2 Cir., 47 F.2d 156, 159, certiorari denied 283 U.S. 837, 51 S.Ct. 486, 75 L.Ed. 1448.

[94] American Banana Co. v. United Fruit Co., 213 U.S. 347, 357, 29 S.Ct. 511, 53 L.Ed. 826, 16 Ann.Cas. 1047; Eastern States Petroleum Co., Inc. v. Asiatic Petroleum Corp., 2 Cir., 103 F.2d 315, 319.

[95] Ibid.

[96] United States v. General Motors Corp., 7 Cir., 121 F.2d 376, 411, certiorari denied 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. ——; Bryant v. United States, 5 Cir., 120 F.2d 483, 485; Dunn v. Unit-

ed States, 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356, 80 A.L.R. 161; Steckler v. United States, 2 Cir., 7 F.2d 59, 60; United States v. Austin-Bagley Corp., 2 Cir., 31 F.2d 229, 233, certiorari denied 279 U.S. 863, 49 S.Ct. 479, 73 L.Ed. 1002; Crichton v. United States, 67 App.D.C. 300, 303, 92 F.2d 224, 227, certiorari denied 302 U.S. 702, 58 S.Ct. 22, 82 L.Ed. 542. See United States v. Bergdoll, D.C.E.D.Pa., 272 F. 498, 505, certiorari denied 259 U.S. 585, 42 S.Ct. 589, 66 L.Ed. 1076.

[97] United States v. Austin-Bagley Corp., 2 Cir., 31 F.2d 229, 233, certiorari denied 279 U.S. 863, 49 S.Ct. 479, 73 L.Ed. 1002.

[98] United States v. General Motors Corp., 7 Cir., 121 F.2d 376, 411, certiorari denied 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. ——.

[99] McCandless v. Furlaud, 296 U.S. 140, 165, 56 S.Ct. 41, 80 L.Ed. 121; United States v. Anderson, 7 Cir., 101 F.2d 325, 332, 333, certiorari denied 307 U.S. 625, 59 S.Ct. 822, 83 L.Ed. 1502; Thornton, Combinations in Restraint of Trade (1928) §§ 211, 454.

shall be done with the specific intent of obstructing the recruiting and enlistment service of the United States. The jury might believe that Nearing did not write these harmful views with the intent of obstructing the recruiting and enlistment service of the United States, and at the same time believe that the Society did print and distribute them with that intent. Such findings would not be inconsistent. This is a matter of fact, of which the jury are the sole judges, and with it we have no concern." [100]

Appellants' contention confuses the concepts of corporate and individual criminal liability. When a corporation is guilty of crime it is because of a corporate act, a corporate intent; in short, corporate commission of crime. [101] The fact that a corporation can act only by human agents is immaterial. [102] How separate is the identity of the corporate person and the individual person, where criminal liability is concerned, is shown by the fact that a corporation may be found guilty of a crime, the essential element of which is a specific criminal intent. [103] This has been often held in conspiracy cases. [104] In at least one state it has been held that the corporation and its agents may be separately counted in order to find the two or more persons necessary for the commission of a conspiracy. [105] In the present case a large number of individuals were named as defendants; some of whom were agents of appellants, others who were not. Moreover, as the two corporations were convicted, the requirement of two persons is satisfied in any event. Consequently, for both reasons, the conviction of appellants does not depend upon the guilt or conviction of their agents.

We have carefully examined appellants' other contentions and find them to be without merit. As we read the record the case was tried carefully and fairly; the jury was properly instructed; and the evidence was adequate to support the verdicts.

Affirmed.

---

[100] 2 Cir., 266 F. 212, 214, certiorari denied 254 U.S. 637, 41 S.Ct. 12, 65 L. Ed. 451.

[101] United States v. Union Supply Co., 215 U.S. 50, 30 S.Ct. 15, 54 L.Ed. 87.

[102] United States v. General Motors Corp., 7 Cir., 121 F.2d 376, 411, certiorari denied 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. ——; United States v. Austin-Bagley Corp., 2 Cir., 31 F.2d 229, certiorari denied 279 U.S. 863, 49 S.Ct. 479, 73 L.Ed. 1002.

[103] American Socialist Soc. v. United States, 2 Cir., 266 F. 212, 214, certiorari denied 254 U.S. 637, 41 S.Ct. 12, 65 L. Ed. 451.

[104] Joplin Mercantile Co. v. United States, 8 Cir., 213 F. 926, 935, 936, Ann. Cas.1916C, 470, affirmed 236 U.S. 531, 35 S.Ct. 291, 59 L.Ed. 705; Note, Ann. Cas.1916C, 459; United States v. MacAndrews & Forbes Co., C.C.S.D.N.Y., 149 F. 823, 835, 836, error dismissed 212 U.S. 585, 29 S.Ct. 681, 53 L.Ed. 661; People v. Dunbar Contracting Co., 165 App.Div. 59, 61, 151 N.Y.S. 164, 166, affirmed 215 N.Y. 416, 109 N.E. 554; State v. Eastern Coal Co., 29 R.I. 254, 268, 70 A. 1, 7, 132 Am.St.Rep. 817, 17 Ann.Cas. 96; Mininsohn v. United States, 3 Cir., 101 F.2d 477, 478.

[105] Standard Oil Co. v. State, 117 Tenn. 618, 667, 100 S.W. 705, 718, 10 L.R.A., N.S., 1015.